IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

N.S., *a minor, by his mother and next friend*, )
Mary Frances Conley,                          )
                                              )
  Plaintiff,                        )
                                              ) Civil Action No. 1:23-cv-848 (RDA/IDD)
  v.                                 )
                                              )
PRINCE WILLIAM COUNTY SCHOOL                  )
BOARD, *et al.*,                              )
                                              )
  Defendants.                        )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants Christopher Beemer and Jenita Boatwright's (the "Individual Defendants") Motion for Summary Judgment (Dkt. 107) (the "Individual MSJ"), Defendant Prince William County School Board's (the "School Board") Motion for Summary Judgment (Dkt. 116) (the "School Board MSJ"), and the School Board's Motion to Strike (Dkt. 143). This Court dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). The Motions are now fully briefed and ripe for disposition. Having considered the Motions, the accompanying Memoranda in Support (Dkts. 108, 117), Plaintiff N.S.'s Opposition to the Motions (Dkts. 125, 144), Defendants' Replies in Support (Dkts. 130, 136, 145), and Plaintiff's Notices (Dkts. 140, 141,

142) the Court GRANTS the Individual MSJ, GRANTS the School Board MSJ, and DENIES the Motion to Strike for the reasons that follow.[1]

## I.   PROCEDURAL BACKGROUND

Plaintiff filed his original complaint on June 29, 2023.  Dkt. 1.  Defendants filed motions to dismiss on November 13, 2023.  Dkts. 7, 8, 10.  Plaintiff then sought and obtained permission to file an amended complaint.  Dkt. 21.  Thereafter, the Court denied the original motions to dismiss as moot.  Dkt. 22.

On December 21, 2023, Plaintiff filed his Amended Complaint.  Dkt. 23.  On January 12, 2024, Defendants filed new motions to dismiss.  Dkts. 24, 27.  Plaintiff filed a consolidated opposition on February 2, 2024.  Dkts. 31, 32.  On February 9, 2024, Defendants filed their replies.  Dkts. 34, 35.  On August 22, 2024, this Court issued a Memorandum Opinion and Order

---

[1] This Court understands that the Court may not have resolved the pending motions as quickly as the parties would have preferred.  The parties must understand, however, that the Court has more than 400 civil cases at any given time and has been inundated with habeas petitions and requests for emergency relief that must be resolved expeditiously.  The Court treats each of its cases with the same level of importance that the parties treat this single case.

In this regard, approximately 6 weeks ago Plaintiff's counsel wrote what can best be described as a terse and inappropriate correspondence to this District Judge questioning the timeliness of the handling of his client's case and how this was affecting counsel's financial bottom line. This kind of correspondence is not well received.

Summary judgment motions always involve an extensive analysis of the record, but this case is particularly fact intensive where the School Board asserts 94 statements of fact, the Individual Defendants assert 86 statements of fact, and, in a maneuver not contemplated by the Rules (as discussed *infra*), Plaintiff asserts 83 facts of his own. The Court has given this case significant consideration and resolved the matter in due course.

Although Plaintiff counsel's reputation is well known to this District Judge, it does not require this Court to drop all things to handle the disposition of his cases out of turn.  Plaintiff's counsel is discouraged from engaging in this kind of correspondence going forward.

denying the School Board's motion to dismiss and granting-in-part and denying-in-part the Individual Defendants' motion to dismiss.  Dkt. 37.

On September 26, 2024, the Individual Defendants filed their Answers.  Dkts. 40, 41. On October 10, 2024, the School Board filed its Answer.  Dkt. 42.  That same day, a Scheduling Order issued.  Dkt. 43.

After discovery closed, the Defendants filed their motions for summary judgment on March 28, 2025.  Dkts. 107, 116.  On April 25, 2025, Plaintiff filed a consolidated Opposition. Dkt. 125.  On May 2, 2025, Defendants filed their Replies.  Dkts. 130, 136.

On August 26, 2025, Plaintiff filed a notice of supplemental authority.  Dkt. 140.  On September 16, 2025, Plaintiff filed a second notice of supplemental authority.  Dkt. 141.  On February 4, 2026, Plaintiff filed a third notice of supplemental authority.  Dkt. 142.  On February 6, 2026, the School Board filed a Motion to Strike all three notices of supplemental authority. Dkt. 143.  On February 6, 2026, Plaintiff opposed the Motion.  Dkts. 144, 145.

## II.  MOTION TO STRIKE

As a preliminary matter, Plaintiff acknowledges that he violated the Local Rules when he filed his three notices of supplemental authority without leave of Court.  Dkt. 145.  However, each of Plaintiff's Notices provides the case citation with only minimal commentary (of approximately two sentences) regarding its relevance and then attaches a copy of the case.  Dkts. 140, 141, 142.  In the Motion to Strike, the School Board provides significantly greater analysis of why each of those three cases does not provide for the result advanced by Plaintiff.  Dkt. 143. As other district judges have recognized, "[g]ranting !Defendants' motion to strike would not preclude the court from applying any existing precedent or considering any other authority." *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 585 (D. Md. 2014);  *Sisk v. Abbott*

3

*Labs.*, 2012 WL 1164559, at *1 (W.D.N.C. Apr. 9, 2012) ("To suggest that a party may not file such a notice and inform the Court of subsequent authority is nonsensical."). To the extent that Plaintiffs' Notices strayed from merely providing notice and into argument, Defendants have now had an opportunity to provide their response. Accordingly, the Motion to Strike will be denied.

### III. UNDISPUTED STATEMENT OF FACTS[2]

Summary judgment is appropriate only where there are no genuine disputes of material fact. *See* Fed. R. Civ. P. 56. To this end, Defendants, in compliance with Rule 56 and Local Rule 56, set forth a statement of material facts in separate enumerated paragraphs that Defendants contend are undisputed and supported by record citations. The Rules next required Plaintiff to respond to Defendants' statements of undisputed fact by "listing all material facts to which it is contended that there exists a genuine dispute" with citations to the record. L.R. 56(B). Plaintiff somewhat complied with this portion of the Rule. Plaintiff did not fully comply with the Rules, however, because Plaintiff also set forth a "Statement of Facts Material to Defendants' Motions." Dkt. 125 at 5. Neither the Rules nor case authority permit this. *See Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 981 (E.D. Va. 2017); *Immunogen, Inc. v. Iancu*, 523 F. Supp. 3d 773, 777–78 (E.D. Va. 2021) (refusing to consider a plaintiff's separate enumerated statement of facts opposing summary judgment), *vacated and remanded on other grounds sub nom. ImmunoGen, Inc. v. Hirshfeld,* 2022 WL 885774 (Fed. Cir. Mar. 25, 2022) (recognizing that it "is from [the movant's] statement of undisputed facts and the nonmovant's response that a district court determines whether genuine issues of fact are disputed"). Furthermore, Plaintiff only partially

---

[2] Except with respect to citations to deposition transcript pages, all citations to page numbers refer to the CM/ECF assigned page designations.

complied with the Rule 16(b) Scheduling Order. Dkt. 45 ¶ 9(f) (requiring responses to facts to be set forth in numbered paragraphs and "indicating whether the non-movant admits or disputes the fact with appropriate citations to the record").[3] Although Plaintiff asserted in numbered paragraph form whether he admitted or denied Defendants' asserted undisputed facts, Plaintiff often did not cite to the record in those enumerated paragraphs. Rather, Plaintiff would refer back to his own statement of material facts for the record citations. *See, e.g.*, Dkt. 125 at 43 ¶ 10 (for citations referring back to "§ I ¶ 2"). This complicates the Court's review in a case where there are already extensive assertions of fact and undermines the purpose of Paragraph 9(f) of the Scheduling Order. The failure to synchronize the asserted facts with the disputes also often made it unclear what portion of the fact Plaintiff was disputing, whether he was simply asserting additional facts, and upon what evidence he relied. Plaintiff is reminded to comply with *every* aspect of this Court's Orders. Nonetheless, the Court takes into account Plaintiff's asserted facts where appropriate and, even where not recounted below as undisputed facts, the Court considered all of the "Material Facts" proffered by Plaintiff in reaching a decision.

Accordingly, the following statement of facts is derived from a careful review of (i) Defendants' statements of undisputed facts; (ii) Plaintiff's Opposition to those facts; and (iii) the summary judgment record as a whole. Given this, the undisputed facts are as follows:[4]

1. Ronald Reagan Middle School ("RRMS") is one of seventeen middle schools within the

---

[3] The Court notes that many of Plaintiff's separately asserted "Material Facts" are duplicative of many of those asserted by Defendants (and simply rephrase those facts). Other facts asserted by Plaintiff contain material that is extraneous to the issues before the Court or are inappropriate argument and not supported by the record. In any event, the asserted Material Facts have been properly referenced where material and appropriate.

[4] Because the facts recounted here are a combination of the undisputed facts asserted by the Individual Defendants and the School Board, they do not neatly track the asserted facts in either brief.

Prince William County Schools ("PWCS") system.

2. Between 2019 and 2022, RRMS had a student population of approximately 1,400 to 1,500 students each school year.

3. For the 2019-2020 school year, Joseph Murgo was RRMS's principal. Defendant Jenita Boatwright was the assistant principal assigned to Plaintiff's class each year that Plaintiff attended. Defendant Christopher Beemer became the principal of RRMS in July 2020.

4. At RRMS, the principal, assistant principals, and administrative interns (who serve on the same level as assistant principals) were the employees with authority to issue formal discipline to students. Counselors and teachers did not have that authority.

5. During the 2019-2020 school year the February 14, 2018 version of Regulation 738-1 was in effect.

6. During the 2020-2021 school year, the February 14, 2018 version of Regulation 738-1 continued to be in effect until it was amended on August 31, 2021. The August 31, 2021 version of Regulation 738-1 was in effect during the 2021-2022 school year.

7. During the 2019-2020, 2020-2021, and 2021-2022 school years, PWCS had annual versions of a Code of Behavior in effect.

8. Plaintiff's mother, Mary Frances Conley, was aware of the Code of Behavior and understood that students, including her own children, had to sign it.

9. Teachers and administrators at RRMS undergo harassment and Title IX training every year.[5]

10. Plaintiff began attending RRMS in sixth grade during the 2019-2020 school year.

11. Plaintiff was homeschooled for the fifth-grade school year and knew only one other

---

[5] The School Board relies on Beemer's deposition testimony that "[t]eachers complete harassment training every year" and that he, himself, had undergone such training and that he goes through it every year. Dkt. 117-127 at 58:16-59:22; *id.* at 119:10-17. Plaintiff attempts to dispute the asserted fact by relying on a December 2, 2021 spreadsheet that indicates that, at that time, he had not yet signed up for the Title IX training. Dkt. 126-77. He also uses this to support his own asserted fact that "Beemer had not completed his Title IX training for the 2021-22 year in a timely fashion." Dkt.125 at 30 ¶ 59. But, Plaintiff's cited exhibit neither contradicts the asserted fact that Beemer went through the training yearly nor supports his asserted fact that Beemer failed to do so in a timely manner. This is so because the exhibit stands only for the limited proposition that, by December 2, 2021, Beemer was not recorded as having taken the specific training referenced. There is no reference for any deadline by which Beemer had to complete this particular training which would render the alleged failure to complete it by December 2, 2021, untimely. Accordingly, there is no genuine dispute of material fact.

student when he began attending RRMS.  He cannot recall whether that student knew that Plaintiff was gay.

12. Plaintiff had also previously attended first grade and fourth grade at Gravely Elementary School in PWCS.  Plaintiff does not know why he was homeschooled for the other years, but he went to Gravely Elementary because he wanted to experience school with other people.

13. Plaintiff recalls some incidents of bullying in fourth grade, but also says that he enjoyed his year at Gravely Elementary.  He returned to home schooling for fifth grade because he wanted another year at home.

14. When Plaintiff enrolled at RRMS, his mother and father, Graham Simms, provided Murgo and other RRMS staff members with information regarding Plaintiff's academic, personal, and medical history.  None of them specifically identified Plaintiff's sexuality as a concern or any history of prior bullying.

15. Specifically, on August 15, 2019, Plaintiff's father wrote that Plaintiff had struggled academically and athletically following a traumatic brain injury in first grade.

16. Plaintiff's mother followed up on August 22, 2019, in another email to Murgo and other staff that Plaintiff begged for homeschooling in fifth grade because he was not being challenged in fourth grade.

17. Plaintiff was eleven years old when he began sixth grade in August 2019, and he has asserted that he began to identify as gay around the same time.  Plaintiff did not specifically tell Boatright or Beemer that he is gay.

18. Plaintiff's parents learned that Plaintiff was gay in his seventh-grade year, as Plaintiff's mother testified in the September 12, 2022 Title IX hearing.  By eighth grade, Plaintiff had only told three or four students that he was gay.[6]

---

[6] Plaintiff attempts to dispute only the portion of the asserted fact that asserts that Plaintiff's parents learned of his sexuality in seventh grade and separately attempts to assert that his parents learned of his sexuality in fifth or sixth grade. Dkt. 125 at 6 ¶ 2; *id*. at 43 ¶ 10.  In this regard, Petitioner does not dispute that Plaintiff's mother testified that she learned of his sexuality in seventh grade, but argues that she was mistaken and overcome with emotion.  Dkt. 125 at 43 ¶ 10.  Plaintiff relies on his father's declaration to both dispute the School Board's fact and to assert his own fact, but he fails to identify any particular paragraph of the declaration on which he relies.  *Id.* at 6 ¶ 2.  Plaintiff's father's declaration avers: "When N told us that he believed he was gay, this news caused no commotion.  I had imagined that this was likely the case. Mary Frances and I took this in stride, as did N's sister.  We remained lovingly supportive of N." Dkt. 126-3; Dkt. 127-1.  This declaration has no reference to time and does not contradict Plaintiff's mother's testimony.  Even assuming it did conflict with the mother's testimony, it is unclear how the father's declaration would properly dispute the mother's testimony.  The mother's declaration likewise does not refer to a specific time, but does suggest that Plaintiff's

19. Plaintiff occasionally wore jewelry, mascara, eyeliner, nail polish, and Pride-themed sneakers to school.[7]

20. On September 11, 2019, students in Plaintiff's drama class took his water bottle and passed it amongst themselves (the "drama class incident").

21. Plaintiff asserts that the other students were uttering slurs like "f*g" and "f****t" during the incident.  Plaintiff did not report this language to his mother nor did he tell anyone at RRMS.[8]

22. The situation was addressed in real time by a teacher.

23. Plaintiff does not recall which students were involved in the drama class incident and does not recall those students mistreating him after that date.

24. That same day, Plaintiff's mother emailed Murgo, Boatwright, and others to report the incident.  The email did not mention that Plaintiff was gay, that the incident may have been motivated by anti-gay sentiment or homophobia, or that the offending students used

---

mother knew in 2019.  *See* Dkt. 126-2 ¶ 2 (no timeframe); *id.* ¶ 5 (suggesting aware in 2019).  But even had Plaintiff relied on this declaration (which he did not), it would run afoul of the sham affidavit rule because it directly contradicts her prior testimony.  *See, e.g.*, *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n.7 (4th Cir. 2001) (noting the "long-standing principle that a party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts"); *Tankesley v. Vidal*, 2023 WL 4273763, at *7-8 (E.D. Va. June 29, 2023) (finding sham affidavit doctrine applicable where a declaration put forward a new explanation that directly contradicted earlier testimony).  Accordingly, there is no genuine dispute of material fact as to the included fact.  And the fact separately asserted by Plaintiff is, thus, also not incorporated into this recitation of undisputed facts.

[7] Plaintiff asserted this fact in his Material Facts, and it is appropriately supported by the record.

[8] Plaintiff asserts that RRMS was "plagued" with complaints of "homophobic bullying." Some of the complaints do not appear related to homophobia. Dkt. 126-31 at 9 ("I really think our students have forgotten or have not learned how to be appropriate with the other gender."). Other complaints do suggest sexual harassment, but not homophobic bullying. *Id.* at 7 (a mother relating that another boy tried to kiss her son and was talking about "inappropriate stuffs [sic] (related to gay and sexual related stuff)" until her son punched him to get away). Others are general complaints that students were "using racial slurs and being homophobic." Dkt. 126-31. Although the Court certainly takes into account that there were other complaints of homophobic bullying (*id.* at 5), Plaintiff's references to these accounts (some of which are not related to homophobic bullying, some of which are second or third hand accounts, and where the results of any investigation are unclear) do not establish that there was a "plague" or that such complaints were all substantiated.

homophobic or other derogatory language.

25. Murgo responded to Plaintiff's mother and copied Boatwright and other staff that "[w]e are on it."

26. The drama class incident was addressed to Plaintiff's mother's satisfaction. There were no other incidents involving Plaintiff's drama class.

27. On September 24, 2019, Plaintiff's classmate, E.A., pulled down Plaintiff's pants in gym class (the "gym class incident"). This was Plaintiff's first interaction with E.A. Plaintiff does not know if E.A. knew that Plaintiff was gay, and E.A. did not use homophobic language.

28. Boatright looked into the incident, and Plaintiff admitted to tripping E.A. twice. Plaintiff asserted that the first trip was an accident, but the second was on purpose. E.A. was required to apologize to Plaintiff, pick up cones, and attend afterschool detention as consequences for his actions. Plaintiff was not disciplined.

29. Plaintiff did not tell his mother about the incident; his mother found out from Boatwright on September 27, 2019.

30. Plaintiff's mother then sent Boatwright two emails complaining that E.A. had not been sufficiently punished. Neither email mentioned Plaintiff's sexuality or suggested that the incident was related to his sexuality.

31. Specifically, Plaintiff's mother indicated that, after an "innocent stumble" by Plaintiff, the other student was focused on "revenge" and was "angry" until it escalated to the student pulling down Plaintiff's shorts. Dkt. 126-13. Plaintiff's mother referred to the incident as "bullying" and asked whether PWCS has a policy for "situations that are clearly physically violent and defined as sexual harassment under US law."[9]

32. On September 30, 2019, Plaintiff and his parents met with Boatwright at RRMS to discuss the gym class incident. During that meeting, Plaintiff's mother was offended by a comment that Boatwright made suggesting that they were seeking a more serious punishment based on racial animus. Neither Plaintiff nor his parents mentioned that they believed the incident occurred because Plaintiff is gay or that it was a form of sexual harassment.

33. After Plaintiff's parents were offended by Boatwright's suggestion, they terminated the meeting and went to see Murgo.

34. Thereafter, Plaintiff's family had a meeting with Murgo and his secretary, Robyn Dudas-Washington. In that meeting, Plaintiff's parents expressed their displeasure with

---

[9] Because all parties refer to the email, it is helpful to include excerpts of what Plaintiff's mother actually said. *See* Dkt. 126-13.

Boatwright.

35. The gym class incident was apparently resolved to Plaintiff's parents' satisfaction.

36. On October 3, 2019, Plaintiff's father emailed Murgo and requested that Boatwright have no further contact with Plaintiff (or his sister also enrolled there).

37. Plaintiff recalls no further incidents or interactions with E.A. following that incident. There were also no further incidents in gym class. Plaintiff also does not recall any prior incidents with E.A.

38. Prior to the gym class incident, Boatwright had no disciplinary issues involving E.A.

39. After the incident between Plaintiff and E.A., Boatwright had two other disciplinary incidents with E.A. – that did not involve Plaintiff – which she categorized as: (i) horseplay, when it involved a headlock and touching another student's genitals, and (ii) obscene/inappropriate language, when it involved pulling another student's head to his groin area.[10]

40. On October 11, 2019, Plaintiff's mother told a social studies teacher, Justin Christopher, that "Principal Murgo has been great about protecting the environment for everyone, so we are moving forward positively."

41. On November 12, 2019, Plaintiff reported to his art teacher, Alicia Fonseca, that his classmate, M.R., had called him "gay boy" and suggested that Plaintiff would perform a sex act on another male "for free" (the "art class incident").

42. Fonseca spoke to M.R. about his conduct.

43. Plaintiff does not recall having any incidents with M.R. previously.

44. Plaintiff told his mother about the incident and she emailed Murgo, Fonseca, and Dudas-Washington. Plaintiff's mother reported the incident as follows:

> [M.R.] began discussing some person who had "sucked someone's d*ck." . . .
> A girl named [P.] said back to [M.R.] that [M.R.] himself would perform the
> act for money. [M.R.] then turned to [Plaintiff] and said "You'd do it for free,
> gay boy!" And followed it up by taunting [Plaintiff] with "Go kiss your

---

[10] Plaintiff offers asserted facts regarding these incidents, which the Court recounts above. Dkt. 126-40 (Exhibits 38(a) and (b)). Plaintiff argues that Boatwright "routinely downplayed the homophobic aspect of student-on-student harassment." Dkt. 125 at 15 ¶ 23. This is argument and is not properly considered as an asserted fact. Moreover, to the extent that Plaintiff suggests that this information is central to Boatwright's credibility, this is also not appropriately considered on summary judgment. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage).

boyfriend!"

45. The next morning, Murgo responded that he "was sorry that this incident occurred" and asked Plaintiff to come to the office to report or write a statement.

46. Plaintiff's mother agreed to allow Murgo to talk to Plaintiff and asked Murgo to show Plaintiff her email so that he knew he had permission to "write down the actual words that he heard." Plaintiff declined to do so.

47. Murgo stated that Plaintiff's mother's email provided him with enough details to address the issue.

48. On November 14, 2019, Fonseca emailed Murgo and told him:

> I was about to contact [Plaintiff's] mom (I was out yesterday), I did talk to both of the boys, spoke to how the words made [Plaintiff] feel, using appropriate and kind words to others and if [Plaintiff] was okay going back to his seat. I also spoke to [Plaintiff] in class today and he said there hadn't been anymore problems. The other child has been moved, Robyn you said you had spoke to [Plaintiff] . . . .[11]

49. M.R. was at least temporarily moved from his seat near Plaintiff in art class. Plaintiff does not recall any further incidents with M.R.

50. Although it bothered Plaintiff that M.R. returned to his art class table, M.R. did not use abusive language again and Plaintiff did not complain or tell his parents.

51. After M.R. was moved, no other reports or complaints about bullying in art class were made by Plaintiff or his parents. Plaintiff's mother respected the decision to move the student's seat and did not feel that anything else needed to be done, although she did not know that M.R. returned to his desk.[12]

52. According to Plaintiff, students were directing homophobic slurs at him during his sixth-grade year at RRMS. Plaintiff did not tell his mother, Boatwright, or anyone else at RRMS about homophobic insults occurring in his sixth-grade year until he began

---

[11] Plaintiff does not dispute the substance of the email. Rather, Plaintiff asserts that the move was temporary and that it bothered him. Dkt. 125 at 7 ¶ 5; *id.* at 43 ¶ 30. Thus, there is no genuine issue of material fact. The Court has addressed Plaintiff's additional facts in this regard and included them *infra*.

[12] Plaintiff did not dispute the content of the asserted fact, but simply added that his mother did not know that M.R. had returned to Plaintiff's desk. Dkt. 125 at 43 ¶ 31. The Court has modified the asserted fact to reflect this additional information.

11

compiling his Title IX complaints in June 2022.[13]

53. Boatwright did not learn of the art class incident until after she left her position as an assistant principal at RRMS.

54. Following a break from in-person school due to the COVID-19 pandemic, Plaintiff returned to RRMS for his eighth-grade school year in the fall of 2021. At that time, Beemer had replaced Murgo as principal at RRMS.

55. Plaintiff does not recall having any interaction with Beemer while a student at RRMS.

56. Although Plaintiff's mother had concerns that Plaintiff was being bullied because of his sexuality by the time that he began eighth grade, she did not express those concerns to Beemer at the beginning of the school year. Nor did she express her concerns to anyone else in RRMS administration.

57. On October 15, 2021, Plaintiff was in the boy's locker room at RRMS when he fell hard into a locker and injured his shoulder (the "locker room incident"). According to Plaintiff, he was shoved from behind by an unknown individual(s). A physical education ("PE") teacher, Thomas (Troy) Lyon, was nearby when the incident occurred and did not attempt to assist Plaintiff.

58. Plaintiff does not know who or what caused him to fall.

59. According to Plaintiff, as reported by his mother, other boys in the locker room asked him, "are you okay?"

60. Plaintiff did not report to anyone at RRMS that he was intentionally shoved into the locker. He was never shoved into a locker again.

61. Plaintiff's parents only found out about the locker room incident after Plaintiff's mother noticed a bruise on his shoulder.

62. That day, Plaintiff's mother emailed Margaret Power, Plaintiff's PE teacher, and Lyon about the incident. That email did not report that Plaintiff had been shoved or that the incident was connected to his sexuality.

63. Lyon, who had been monitoring the locker room, did not recall the gym locker incident

---

[13] Insofar as the fact asserted is intended only to reflect on the events of sixth grade, Plaintiff has raised no genuine dispute of material fact. The fact as originally asserted did not include a timeframe with respect to the second sentence, but based on its inclusion during a discussion of matters during sixth grade and the first sentence, the Court infers that the second sentence is intended to be similarly limited. Accordingly, the Court has modified the assertion of fact. Plaintiff's assertion in this regard is that "N told his parents of the bathroom assaults in May [2022]." Dkt. 125 at 41 ¶ 23. This does not dispute the fact as modified. Accordingly, there is no genuine dispute of material fact.

happening.

64. Lyon called Plaintiff's mother and spoke to her. Lyon offered Plaintiff a separate area to change, but Plaintiff's mother declined. Lyon advised Plaintiff's mother to contact him if anything changed. There was no further contact between Lyon and Plaintiff's mother.

65. The following Monday, Power and Lyon spoke to Plaintiff to ask if he was doing okay and also let him know that he should immediately report such incidents to a teacher in case he required medical attention.

66. Lyon also asked Plaintiff whether he would like to provide a statement of what happened; Plaintiff declined and said he was fine.

67. Plaintiff did not experience any further incidents in the locker room for the remainder of the 2021-2022 school year. But, according to Plaintiff, he was repeatedly shoved or run into by other students while on the track during gym class or walking in the hallways between classes. He did not report this conduct to his mother or anyone at RRMS until June 2022.

68. Beemer was not aware of the locker room incident when it occurred.

69. On December 9, 2021, Plaintiff was waiting outside RRMS to be picked up by his mother. As she arrived, she saw five unfamiliar boys (K.R., B.F., D.S., T.C., and J.J.) with Plaintiff (the "school pickup incident").

70. Before this date, Plaintiff had not told his mother or anyone else at RRMS that K.R., B.F., D.S., T.C., or J.J. had mistreated him in any way.

71. Plaintiff forced his way past the boys and the boys moved away and did not prevent Plaintiff from getting in the car.

72. Plaintiff's mother was in her vehicle and did not hear what the boys were saying to Plaintiff. According to Plaintiff, the boys began directing slurs like "f*g" and "f****t" at him. She felt Plaintiff was being bullied and took a picture of the students.

73. After Plaintiff got in the car, Plaintiff's mother began to pull away, but then circled back after she felt the boys continued to harass her vehicle.

74. Plaintiff's mother did not know what had happened between the boys, but she exited her van and approached. Two teachers, Elizabeth Kelleher and Carrie Rauch, came over and spoke to her.

75. Plaintiff's mother suggested that the boys had been bullying Plaintiff, but did not assert that such bullying was based on his sexual orientation.

76. The teachers told Plaintiff's mother that they would handle the matter, and she led them over to the boys.

13

77. When Plaintiff's mother returned to her van, she called RRMS's front office and reported the incident to Holly Ramey, an administrative assistant. She did not tell Ramey that the incident may have been motivated by Plaintiff's sexual orientation.

78. Ramey offered to have Plaintiff's mother speak to Boatwright, but Plaintiff's mother declined. She was told that no one else was available to speak with her.

79. Although Boatwright heard about this incident when it occurred, she was not tasked with addressing it.[14]

80. Later that same day, Plaintiff's mother emailed Plaintiff's homeroom teacher, Paul Anderson, that she believed Plaintiff had been bullied in front of the school and included pictures of the boys. The email also did not indicate that he had been bullied based on his sexual orientation.

81. Plaintiff did not contemporaneously report to his mother that the boys had used homophobic slurs. This was disclosed in June 2022.

82. The teachers who had been with Plaintiff's mother later informed RRMS staff, including Beemer, that her perception of events was not accurate. Beemer spoke with the teachers as well and confirmed that was their assessment of the situation.

83. K.C., a female student who had been with Plaintiff during this incident and witnessed the incident, was questioned by PCWS's Title IX investigator on July 11, 2022. She denied that the boys were being disrespectful to Plaintiff, that Plaintiff was surrounded by the boys, or that he had to push through anyone to get in the car. She also did not see the boys making gestures or mocking Plaintiff or his mother.

84. Plaintiff's mother had no further communications with RRMS administrators or teachers regarding the school pickup incident.

85. On December 27, 2021, during RRMS's holiday break, Plaintiff's mother emailed RRMS' director of school counseling, Amy Covell-Sharek, regarding an "ongoing pattern of hostility" toward Plaintiff from a female RRMS student, A.S. Plaintiff and A.S. were both on the swim team.

86. On January 13, 2022, Plaintiff's mother emailed Covell-Sharek again to report that A.S.

---

[14] The Individual Defendants assert that Boatwright was not tasked with addressing this incident because Plaintiff's mother did not want her involved, in reliance on Boatwright's testimony as to her understanding. Dkt. 108 ¶ 43. Plaintiff attempts to dispute this portion of the fact by noting that it was Plaintiff's father who did not want Boatwright involved and that Plaintiff's mother decided to give Boatwright another chance. Dkt. 125 at 24 n.25; *id.* at 41 ¶ 43. It does not appear material who did not want Boatwright involved or whether Boatwright's perception in that regard was correct. Ultimately, the assert that Boatwright was not involved is undisputed. Accordingly, the Court has limited the asserted fact to that portion, and there is no genuine dispute of material fact.

had purposefully shoved Plaintiff from behind into a metal door earlier that day.  At the time, Plaintiff was facing away from A.S. and looking at his phone.

87. The email contained no report of homophobia or anti-gay bias.

88. On January 14, 2022, Covell-Sharek forwarded the email to Beemer, Boatwright, and School Security Officer Karen Ciminelli and responded to Plaintiff's mother, cc'ing Boatwright and Ciminelli.

89. The same day, Boatwright asked Ciminelli to look into the incident.

90. On January 18, 2022, Boatwright emailed Plaintiff's parents, informing them that she was reviewing the surveillance footage.  Boatwright also expressed that, in the meantime, adjustments would be made to A.S.'s and Plaintiff's schedules to limit their contact with one another.

91. Boatwright spoke with A.S. and Plaintiff.

92. Boatwright and Ciminelli reviewed the security footage of the incident together and determined that the contact was caused by a surge of students pushing A.S. into Plaintiff, who had been looking at his phone.

93. Boatwright informed Plaintiff of her conclusion.

94. Boatwright asked both students to keep their distance from one another.

95. Plaintiff's conflict with A.S. stemmed from the swim team, he had no reason to suspect that she would be violent with him, and he does not recall whether she knew that he is gay.

96. During a January 19, 2022 phone call with Boatwright regarding the incident with A.S., Plaintiff's mother made clear that she did not want to speak with Boatwright further.

97. Plaintiff's mother did not contact Beemer regarding the incident with A.S.

98. That same day, Plaintiff's mother emailed Covell-Sharek regarding Boatwright's handling of the incident between N.S. and A.S.  Covell-Sharek responded that Beemer may need to become involved.

99. In response, Plaintiff's mother suggested that Beemer's first stop should be conferring with Murgo about "the past history."

100. Covell-Sharek forwarded Beemer several of the emails that Plaintiff's parents sent to RRMS administration in 2019 after their disagreement with Boatwright regarding the gym class incident.

101. Beemer called Murgo twice but never received a response.  He also spoke with Boatwright regarding how best to interact with the parents.

15

102.    Following the incident on January 13, 2022, Plaintiff did not experience any further incidents with A.S., and he has no reason to suspect that any mistreatment directed at him by A.S. was due to his sexuality.

103.    On March 21, 2022, Plaintiff's mother wrote to Plaintiff's civics teacher, Scott Cloud, that they were exploring the idea of moving to Europe.

104.    In early April 2022, Plaintiff and his family went on vacation to Las Vegas. During that vacation, Plaintiff and his family began discussing a move to England. Steps were taken to place Plaintiff at a school in England, and, as of May 6, 2022, Plaintiff's parents had arranged for him to be considered for admission to a school in England. In an email to Covell-Sharek that day, Plaintiff's mother explained that moving abroad had "enrichment opportunities" for Plaintiff.[15]

105.    By May 2022, Plaintiff had not told any RRMS staff that he was gay.

106.    On May 6, 2022, Plaintiff's counselor, Meagan Huntington, alerted Boatwright to an interpersonal conflict between Plaintiff and A.R.

107.    Boatwright directed Huntington to conduct a mediation between the two students and to contact Boatwright if she could not resolve the issue.

108.    Plaintiff recalls that the conflict involved A.R. not liking that Plaintiff was socializing with one of her friends. He did not have any further contact with A.R.

109.    On May 13, 2022, Plaintiff was in a bathroom stall when unidentified students came into the bathroom (the "First Bathroom Incident"). Plaintiff gave the following account of the incident on May 16, 2022:

> In the afternoon during 7th period I left the classroom to use the restroom. Due to the bathrooms being closed and 6th graders being weird in one I ended up in the bathroom next to the performance art hall. A bit after that I heard a bunch of boys come in and they started banging on the door and making weird noises. As soon as I got up they all shuffled out and I didn't see any of their

---

[15] Plaintiff does not dispute the substance of this asserted fact. Instead, he argues that Plaintiff was led to these concessions by opposing counsel in deposition. Dkt. 125 at 43 ¶ 52. But, in the first instance, this argument is merely based on an assertion by counsel. And, in the second instance, Plaintiff cites nothing that would suggest that this is a proper basis on which to dispute an asserted fact. Moreover, Plaintiff's counsel does not suggest that he was precluded from rehabilitating his client with respect to the statements for which opposing counsel "fed him the words." *Id.* Plaintiff otherwise asserts: "The decision to move came after, and because of, the lack of response to the two bathroom assaults." *Id.* Nothing in the fact asserted by the School Board suggests when the decision to move was made; the School Board simply asserts that Plaintiff's family was exploring the idea and taking steps to potentially effectuate it by May 6, 2022. Accordingly, there is no genuine dispute of material fact.

faces. I went back to class and talked about how you can't even use the bathroom in peace anymore.[16]

110.    Plaintiff was mortified about the situation, and it was difficult for him to write his account.

111.    Plaintiff did not report the incident to anyone at RRMS. The incident came to light when others informed Huntington that students were "like harassing [Plaintiff] or whatever."[17] According to Plaintiff, this sort of behavior occurred at RRMS without

---

[16] Plaintiff does not dispute that this is what his account says. Dkt. 125 at 43 ¶ 53 ("Agreed as to text, but see §I at ¶44 relative to N's creation of his note."). To the extent that Plaintiff's declaration suggests that the declaration was difficult to write, that suggestion has been included *infra*. To the extent that Plaintiff now suggests that his statement was incomplete, this contradicts his deposition testimony. Here, Plaintiff was asked whether the statement he gave contained a "full and truthful description of what had occurred" and he answered: "Yes, I believe so." Dkt. 117-124 at 180:7-17. Now, Plaintiff contradicts his deposition answer by asserting in his post-deposition declaration: "Neither that statement nor the statement of the May 19 attack was complete." Dkt. 126-4 ¶ 44. Although the declaration provides some explanation for a difference between his statement to the school and his declaration in opposition to summary judgment, he provides no explanation for the contradiction between his answer at deposition and his sworn declaration. *See, e.g.*, *Spriggs*, 242 F.3d at 185 n.7; *see also Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 854–55 (10th Cir. 1999) (finding an affidavit from a witness that "more clearly recalled discussions and meetings" that the witness could not remember during his deposition "arguably contradicted his deposition" and therefore "represent [ed] an attempt to create a sham issue of fact"). Accordingly, Plaintiff has not properly disputed the asserted fact or properly supported a suggestion that the statement regarding the May 13 incident was incomplete.

[17] Plaintiff attempts to dispute the facts asserted by the School Board and by the Individual Defendants by asserting the information that Huntington was later advised that "students were harassing him or whatever." Dkt. 125 at 20 ¶ 34; Dkt. 125-53 at Bates 48197. This addition does not dispute the asserted facts but has nonetheless been included in the undisputed facts because it reflects Huntington's assessment of the situation. Plaintiff attempts to further expand on this by relying on Huntington's deposition testimony that the students were using "homophobic slurs, things like 'gay' and 'f*g.'" Dkt. 125-9 at 55:13-21. This testimony is clearly hearsay, it is an out of court statement that Plaintiff is attempting use to prove the truth of the matter asserted (that is, the students were using homophobic slurs). Fed. R. Evid. 801(c). Plaintiff offers no hearsay exception. The Fourth Circuit has long recognized that "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). Indeed, the difficulty in relying on such evidence is clear where Huntington's recollection about what unidentified students said is contradicted by Plaintiff himself, who did not recall any such homophobic statements. *See* Dkt. 117-124 at 186:8-12. Accordingly, Plaintiff has neither adequately disputed the facts asserted by Defendants nor supported the fact he himself asserts.

regard to sexuality.

112.    Huntington left a message for Plaintiff's mother informing her of the incident.

113.    Plaintiff could not identify the students in the bathroom.  No homophobic slurs were used, and the only sounds Plaintiff identified were "weird noises."[18]

114.    On Monday, May 16, 2022, Plaintiff's mother spoke with Huntington about the incident.  Plaintiff's mother did not speak with anyone else at RRMS about the incident that week.

115.    That same day, Plaintiff provided RRMS with his statement.

116.    Boatwright was made aware of the incident, and she spoke to Plaintiff who told her that someone had knocked on the stall and had not said anything.  Boatwright asked Plaintiff to tell her if it happened again or if he recalled additional details.[19]

117.    Beemer believed that this incident did not fall within Title IX because nothing was said by these students, Plaintiff could not identify them, and there was no indication that the students knew that Plaintiff was in the bathroom stall.[20]

---

[18] Here, Plaintiff attempts to dispute his own deposition testimony with hearsay testimony from Huntington.  Dkt. 125 at 43 ¶ 55.  For the same reasons stated *supra*, Plaintiff has failed to adequately dispute the asserted fact, including that Plaintiff heard only "weird noises."

[19] Defendants both assert that Boatwright spoke to Plaintiff following the May 13 incident in reliance on Boatwright's testimony.  Dkt. 117-128 at 27:7-28:13.  Plaintiff attempts to dispute Boatwright's testimony with his own post-deposition declaration.  Dkt. 126-4 ¶ 44 ("No one from administration ever asked me about what had happened to me in the bathroom").  But again, Plaintiff was asked this in his deposition and said he could not recall.  Dkt. 136-137 at 265:13-17 ("Q. . . .  Did you ever talk to Ms. Boatwright about that incident? A. I don't recall.").  His response now is offered without the benefit of cross examination and with no explanation as to why he can now recall that no one from administration talked to him.  *See Mitchael*, 179 F.3d at 854–55 (finding an affidavit from a witness that "more clearly recalled discussions and meetings" that the witness could not remember during his deposition "arguably contradicted his deposition" and therefore "represent[ed] an attempt to create a sham issue of fact"); *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) ("Where a deponent is 'asked specific questions about, yet denie[s] knowledge of, the material aspects of her case, the material allegations in her affidavit directly contradict her deposition.'").  Plaintiff cannot now contradict his deposition testimony, especially where he provides no explanation for the contradiction.  Accordingly, there is no genuine dispute of material fact.

[20] Plaintiff concedes that he cannot dispute what Beemer believes.  Dkt. 125 at 43 ¶ 57.  Instead, Plaintiff relies on his mother's declaration recounting a phone call from weeks after the event, in which Beemer is alleged to have stated "we dropped the ball."  Dkt. 125 at 31 ¶ 62.  Plaintiff's assertions regarding Beemer's statement are not material to the asserted fact, and, also,

118.    On June 2, 2022, Beemer was informed by Title IX Coordinator Dana Scanlan that Plaintiff's mother was claiming homophobia against Plaintiff led to the May 13, 2022 bathroom incident. She asked that the responsible administrator submit an online report to the Title IX office.

119.    Beemer then asked Boatwright to submit a report regarding the incident, which she did.

120.    On the morning of May 19, 2022, Covell-Sharek received an email from Karen Edwards of the Devenport High School for Boys in England. She informed Covell-Sharek that she had been liaising with Plaintiff's family concerning Plaintiff taking an entrance exam for Devenport.

121.    Later that day, Plaintiff experienced a second bathroom incident (the "Second Bathroom Incident"). Plaintiff dictated a statement to administrative intern Lauren Carter describing the incident and recalled being in a bathroom stall when a group of boys came in and started body slamming the stall door. This happened 7 to 10 times. Plaintiff recalled a student saying, "come out so we can beat your ass."

122.    Plaintiff kicked the door outward and saw the kids run away, but was unable to identify the students. He does not recall telling anyone that he believed that the incident occurred because of his sexual orientation or that he was being bullied because he was gay.[21]

123.    Huntington informed Boatwright of the May 19 bathroom incident on the day that it occurred.

124.    According to Plaintiff's mother, during conversations with Huntington on May 19 and 20, 2022, she disclosed to Huntington that Plaintiff is gay. They also discussed the May 19 bathroom incident.

125.    Plaintiff's mother did not contact Beemer or Boatwright about either bathroom

---

Beemer's statement does not appear material in general, as the "we dropped the ball" comment is provided without context. Accordingly, there is no genuine dispute of material fact.

[21] Plaintiff does not dispute that he made the statement to Carter, that he did not identify the other students, or that he did not claim that the incident was related to his sexual orientation. Dkt. 125 at 42 ¶ 67; *id.* at 44 ¶¶ 61, 62. Instead, Plaintiff argues that he minimized the event "even to his mother." Dkt. 125 at 44 ¶ 61. The Court recounts *infra* that what the boys stated they said included the use of the term "f*g." The Court assumes that this is to what Plaintiff intends to refer when he argues "other students said more," but, because Plaintiff does not elaborate and instead cites only to entire exhibits, it is unclear. Dkt. 125 at 44 ¶ 62; Dkt. 126-97 (recounting the use of the word "f****t"); Dkt. 126-99 (same). Accordingly, there is no genuine dispute of material fact, and the additional information asserted by Plaintiff is taken into account *infra*.

incident between May 13 and May 20, 2022.

126.     On Saturday, May 21, 2022, Plaintiff's mother emailed Plaintiff's teachers and informed them that he would not be returning to RRMS for the balance of the school year because of the mistreatment that he had suffered from other students based on his sexual orientation.

127.     Some of Plaintiff's teachers forwarded the emails they received from Plaintiff's mother to Beemer or Boatwright. At the time, Boatwright had yet to learn that Plaintiff identified as gay or that he believed he had been the target of homophobic mistreatment, and Beemer believed that he was already addressing Plaintiff's mother's concerns because he was investigating the May 19 bathroom incident.[22]

128.     The investigation into the May 19 bathroom incident revealed that J.S., T.K., and M.Y. were involved. The students were identified by, at the latest, June 3, 2022, by reviewing the surveillance footage and interviewing M.Y. and then T.K.

129.     M.Y. stated that a "person who looked like a girl came out." M.Y. was confused and said "this is the boys bathroom." Another student, J.S., started saying "racial slurs to the student" and called "the girl a f*g [and] a N***a." M.Y. watched this with his friend T.K. and recalls saying "aren't you a guy at the stall."

130.     After the student who made the comments in the bathroom had been identified, Beemer spoke with J.S., who said something to the effect of "That's how I talk." J.S. told Beemer that he did not know who was in the stall at the time. J.S. was already facing suspension, but he received additional consequences for his actions in the bathroom.

131.     Plaintiff has no recollection of any interactions with J.S., M.Y., or T.K., nor had he reported to his mother or anyone at RRMS that he had a prior issue with any of those students.

132.     Beemer testified that, prior to June 2, 2022, he called Scanlan in the Title IX office to obtain guidance and was told he did not need to file a Title IX report. After Scanlan received an email from Plaintiff's mother recounting the incident on June 2, 2022, however, Scanlan noted, "I don't believe I have received any reports about the

---

[22] Regarding Boatwright, Plaintiff asserts that she was on notice as of May 23, 2022, that Plaintiff had been victimized by homophobic harassment. Dkt. 125 at 42 ¶ 72. Plaintiff further asserts that Huntington was frustrated with Boatwright's perceived inaction. *Id*. These assertions do not constitute genuine disputes of material fact. Furthermore, Huntington's frustration appears irrelevant to consideration of the issues presented here.

Plaintiff also attempts to dispute that Beemer was investigating the May 19 bathroom incident. But Plaintiff points to no evidence that directly contradicts Beemer's testimony. *See* Dkt. 108-15 at 64:10-65:19 ("I was working with Ms. Carter to look at video footage at the time."). Accordingly, there is no genuine dispute of material fact in this regard.

concerns expressed below" and directed him to have the responsible administrator submit a report.[23]

133.    Beemer learned about, and investigated, the May 13 bathroom incident in the course of investigating the May 19 bathroom incident. The student who called Plaintiff a "gay a\*\*" during the May 19 incident received consequences.[24]

134.    Beemer was directed to submit a report to the Title IX office, which he did.

135.    Beemer called Plaintiff's mother on June 3, 2022, to speak with her regarding the incidents after he learned that Carter had not yet contacted Plaintiff's parents, as he expected.[25]

136.    Plaintiff did not return to RRMS after May 19, 2022. Prior to the end of the school year, however, Plaintiff came to RRMS to take a make-up exam. Arrangements were made to permit Plaintiff to take the exam in the library and have access to a private bathroom.

137.    On May 31, 2022, Plaintiff received an email from a high school student at Battlefield High School ("BHS"), D.K., consisting of what appeared to be a quote from a suicide note written by author Virginia Woolf to her husband. The student had not previously mistreated Plaintiff in any way.

---

[23] Plaintiff attempts to dispute the asserted fact that Beemer contacted Scanlan. Dkt. 125 at 42 ¶¶ 72, 75, 76. Plaintiff's cited evidence does not directly contradict Beemer's testimony that he reached out to Scanlan, however. But the email from Scanlan that Plaintiff provides includes additional information, and the Court has added it to the asserted fact. Accordingly, there is no genuine dispute of material fact.

[24] Here, Plaintiff's failure to comply with Rule 56 and the Rule 16(b) Scheduling Order has rendered Plaintiff's attempted dispute indecipherable. Plaintiff includes the Individual Defendants' asserted fact in paragraph 76 as amongst three paragraphs that Plaintiff indicates a basis to challenge. Dkt. 125 at 42 ¶¶ 72, 75, 76. The text of Plaintiff's dispute, however, does not appear to refer to any part of paragraph 76. In support of his dispute, Plaintiff cites back to his own asserted facts in paragraphs "55, 57, 59-64, n. 29, n. 31 at 27 *supra*." *Id.* But those paragraphs contain numerous asserted facts, none of which clearly relate to the facts asserted in paragraph 76. Thus, Plaintiff has failed to create a genuine dispute of material fact in this regard.

[25] Plaintiff asserts that Carter was never charged to contact Plaintiff's mother, only to review videos of the bathroom attacks. Dkt. 125 at 42 ¶ 77 (citing back to Plaintiff's own facts). Plaintiff correctly recounts that Carter did not recall being tasked to make such a report. Dkt. 126-92 at 24:13-17. But this does not dispute Beemer's testimony that he assumed or expected her to call. Dkt. 108-15 at 65:16-9 ("At some point in speaking with Ms. Carter, I became aware that she had never made a phone call to Ms. Conley. So at one point, when I learned that, I did call."). The asserted fact has been so modified, and there is no genuine dispute of material fact.

138.     Staff at RRMS and BHS investigated D.K.'s conduct.

139.     In particular, Beemer met with Carter, advised the assistant principal at BHS, and requested that the assistant principal handle any discipline of D.K.

140.     Administration at BHS intervened with D.K., contacted his parents, and warned that D.K. would face out-of-school suspension if the behavior continued. After this email incident, Plaintiff did not hear from D.K. again.

141.     The BHS assistant principal informed Beemer that the matter had been addressed.

142.     Before June 2022, Plaintiff's mother had never expressed to Beemer that Plaintiff may have been mistreated at RRMS because of his sexual orientation.

143.     By June 2, 2022, Plaintiff's mother was in contact with Beemer and PWCS' Title IX office regarding her concerns about Plaintiff's treatment at RRMS. Before then, Plaintiff's mother had never spoken with Beemer regarding Plaintiff's sexual orientation.

144.     Beemer did not know Plaintiff is gay or that he may have been the target of homophobic mistreatment until after the May 19 bathroom incident. Additionally, Beemer does not recall ever having witnessed "anti-gay statements" being made against Plaintiff or any other student at RRMS.

145.     On June 3, 2022, Plaintiff submitted an English assignment regarding bullying experienced by LGBTQ Youth and stating: "The fun game is called let's bully the gay kid. All they need is a target. I'm that." Dkt. 126-36. Around the same time at the end of the school year, Plaintiff also submitted a French project, which translated to English states, "students don't like me," "[s]chool is dangerous," and "I hate school." Dkt. 126-37. But the only reference to his sexuality in this project is a rainbow-colored "14." *Id.*[26]

146.     On June 7, 2022, Plaintiff returned to RRMS to take a Standards of Learning test. According to Plaintiff, C.B. and B.F. glared at him, pretended to trip over him, and "kind of" kick him.[27]

---

[26] Plaintiff asserted facts regarding these end-of-year projects, which are supported by citations to the record, and are included above. Plaintiff's argument and commentary are not. *See, e.g.*, Dkt. 125 at 15 ¶ 20 ("So much for N's palpable anguish.").

[27] Plaintiff attempts to establish that in addition to the kicking that Plaintiff reported at the time, he was also subjected to "homophobic slurring." Dkt. 125 at 42 ¶ 83. In this regard, Plaintiff cites to his own statement of facts, which in turn cites to his declaration and his mother's declaration. Dkt. 125 at 29 ¶ 58 (citing Dkts. 126-2, 126-4). To the extent Plaintiff attempts to rely on his mother's declaration to establish that such homophobic slurs were made, he cannot because his statements to his mother are hearsay and she lacks personal knowledge regarding whether any such slurs were actually made; thus, those statements are inadmissible. *Md. Highways Contractors Ass'n*, 933 F.2d at 1251. To the extent Plaintiff attempts to rely on his

147.     Before Plaintiff's parents filed a Title IX complaint on Plaintiff's behalf in June 2022, the art class incident involving M.R. is the only occasion on which Plaintiff can recall telling any principal, assistant principal, counselor, or teacher at RRMS that he was being mistreated because he was gay.

148.     Beginning on June 10, 2022, and continuing through June 23, 2022, Plaintiff and his family filed a series of complaints with PWCS' Title IX office, naming twenty-six students along with Beemer, Boatwright, and Power as the individuals who committed misconduct.

149.     Plaintiff and his parents also filed complaints against RRMS staffers Jonathan Bukva, Elizabeth Kelleher, Michael Kotwicki, Lyon, Holly Ramey, Carrie Rauch, James Thousand, and Natasha Roman.

150.     In his Title IX complaint, Plaintiff alleged for the first time that student N.N. – and only N.N. – had made statements such as "straight pride," "pray the gay away," and "may the power of Christ compel you." Plaintiff never told anyone about this incident with N.N., including his parents, until June 2022.

151.     In conjunction with his June 2022 Title IX complaint, Plaintiff compiled a Supplement containing photographs of 24 RRMS students who had mistreated him because of his sexuality during his time at school.

152.     In addition to the students and events noted above – the gym class incident, the art class incident, the school pickup incident, the A.S. incident, and the A.R. conflict – the Supplement described how students regularly called Plaintiff homophobic slurs, glared at him, "shoulder barged" him, took his backpack, and otherwise mistreated him. Other than the specific incidents discussed above, however, Plaintiff never reported this mistreatment to anyone prior to preparing and filing his Title IX complaint in June 2022.

153.     According to Plaintiff, twenty of the students that he identified in the Amended Complaint began hurling homophobic slurs at him "[r]ight at the beginning" of his sixth-grade year in 2019.

154.     As part of PWCS' Title IX investigation, Plaintiff was interviewed about each of the students he had accused of hurling homophobic slurs, and was specifically asked

---

own declaration, his declaration once again runs into his prior deposition testimony. Dkt. 108-1 at 274:2-8. Plaintiff was asked to describe what happened during this incident and did not mention any homophobic slurs. *Id.* Plaintiff's interrogatory responses similarly failed to include any reference to such homophobic slurs. Dkt. 134-1 at 13 (asserting boys "glared hatefully" and "walked so closely past [Plaintiff]"). Plaintiff was specifically asked to describe this incident in his deposition, and he did not include any reference to homophobic slurs; it thus contradicts his prior description of events to now assert that he was subjected to such slurs. *See Juarez v. Utah*, 263 F. App'x 726, 734-36 (10th Cir. 2008) (affirming exclusion of post-discovery affidavit that provided evidence of alleged racial slurs that plaintiff claimed she could not recall at her deposition). Accordingly, there is no genuine issue of material fact.

when he came to know each of these twenty students. Plaintiff told the Title IX investigator that, of the twenty students he had accused of hurling homophobic slurs at him in the beginning of sixth grade, he first came into contact with seventeen of them in the 2021-2022 school year, when he was in eighth grade.

155.    Those seventeen students were: B.F., C.R., J.D., N.N., C.W., H.B., T.C., W.R., Y.A., Z.M., D.S., G.H., J.J., K.R., M.L., N.F., and Y.N.

156.    Plaintiff told the PWCS Title IX investigator that he had known only C.B., T.L., and M.R. since sixth grade.

157.    Plaintiff never told his parents that students were subjecting him to homophobic slurs or "barged" into him as the alleged incidents were occurring and only disclosed those incidents to his parents after he stopped attending RRMS.

158.    Plaintiff never told any of his teachers, counselors, or administrators at RRMS that students were subjecting him to homophobic slurs on a daily basis or were shoulder barging him.

159.    Prior to filing the Title IX complaint on June 10, 2022, and with the exception of the incident involving M.R. on November 12, 2019, in art class, Plaintiff's mother never reported to anyone employed by PWCS that Plaintiff had been called homophobic slurs by a classmate, even though she testified in her deposition that Plaintiff told her in September 2019 that he was being called homophobic slurs.

160.    Plaintiff's mother further testified that, while she "intended to" do something about it, she never did, until Plaintiff filed his Title IX complaint.

161.    Prior to June 2022, Plaintiff's father never reported to anyone employed by PWCS that Plaintiff had been called slurs from his classmates.

162.    Plaintiff knew about and had the opportunity to join the No Place for Hate program at RRMS, which is an "anti-bullying program," but did not join or go to that program for help.[28]

---

[28] Plaintiff objects that the School Board's asserted fact about No Place for Hate is a "misleading truncated presentation of testimony." Dkt. 125 at 44 ¶ 80. It is completely unclear what about the asserted fact is misleading, for Plaintiff never says. The asserted fact includes the assertion that Plaintiff did not go to the program because "he was not invested in participating or getting help from anti-bullying program." Dkt. 117 at 18 ¶ 80. The Court assumes that this is the portion of the fact to which Plaintiff objects, as it reads awkwardly. Although Plaintiff did agree that he was not "invested," the Court finds that this is not material and so did not include that portion of the asserted fact in its undisputed facts. Accordingly, there is no genuine dispute of material fact.

163.　　　Plaintiff signed the No Place for Hate pledge.[29]

164.　　　Plaintiff never told Murgo, who Plaintiff knew he could go to for help, that students were using homophobic slurs against him on a daily basis.

165.　　　Plaintiff never told Beemer, Boatwright, or any other assistant principal at RRMS that students were saying homophobic slurs on a daily basis.

166.　　　Teachers, counselors, and administrators did not see students using homophobic slurs against Plaintiff.[30]

167.　　　None of Plaintiff's teachers, counselors, or administrators were ever told about these daily incidents where students were using homophobic slurs against Plaintiff. [31]

168.　　　PWCS' Title IX office began an investigation upon receiving Plaintiff's complaints.  The claims against J.S., E.H., A.R., A.S., D.K., and E.A. were dismissed because their alleged conduct did not fall within the scope of Title IX.

169.　　　"After exhaustive investigations, including interviews of [Plaintiff], his parents, the accused students, student witnesses, and RRMS teachers and staff, PWCS's Title IX office rendered its decisions as to the remaining students."

170.　　　N.N. was found to have violated Title IX for his alleged conduct.  As a consequence, N.N. was placed at Independence Nontraditional School, an alternative school operated by the School Board.

171.　　　Students C.B., C.R., D.S., G.H., H.B., J.D., K.R., N.F., T.L., W.R., Y.N., and M.L. were found not to have violated Title IX, but were found to have violated the Code of Behavior for the reasons identified in each student's determination letter.

172.　　　During the course of the investigation, Title IX investigators found that certain students, including Plaintiff, used the word "gay."

---

[29] This fact is asserted by Plaintiff both as part of his Material Facts and in response to Defendants' asserted facts.  It is appropriately supported by the record and incorporated herein.

[30] Plaintiff does not dispute this asserted fact but merely offers the commentary that, given the atmosphere at RRMS, it is "understandable that no adult focused specifically on slurs aimed uniquely at him."  Dkt. 125 at 44 ¶¶ 83, 84.  This is not a dispute of fact and is unsupported by any citation to the record.  Accordingly, there is no genuine dispute of material fact.

[31] Plaintiff does not dispute this asserted fact but again merely offers the commentary that, given the atmosphere at RRMS, it is "understandable that no adult focused specifically on slurs aimed uniquely at him."  Dkt. 125 at 44 ¶¶ 83, 84.  This is not a dispute of fact and is unsupported by any citation to the record.  Accordingly, there is no genuine dispute of material fact.

173.      During the course of the investigation, certain students admitted to using homophobic language towards one another "jokingly" and suggested that Plaintiff may have overheard them.

174.      It is educators' experience that middle school students often use inappropriate language, including the words "f*g" or "f****t," without homophobic intent, but that the use of such slurs is still unacceptable at school.

175.      B.F., C.W., J.J., M.R., T.C., Y.A., and Z.M. were found to have not violated Title IX or the Code of Behavior for the reasons identified in each's determination letter.

176.      The students who violated the Code of Behavior were referred to their principals at their high schools for counseling and additional discipline as warranted.

177.      In response to the complaints filed against Beemer, Boatwright, Power, Bukva, Kelleher, Kotwicki, Lyon, Ramey, Rauch, Thousand, and Roman, PWCS' Office of Equity and Employee Relations conducted an investigation into each of the complaints and determined that they were unfounded.

178.      Plaintiff did not attend BHS for his ninth grade year. BHS was prepared to institute supportive measures for Plaintiff had he attended, including hand-scheduling to ensure limited contact with respondents from the Title IX complaint, regular meetings with the school counselor or other wellness professionals (including a meeting at the beginning of the school year), as-needed academic accommodations, and mutual no-contact orders with the students who had been accused of sexual harassment by Plaintiff. At all times, BHS was prepared to provide Plaintiff with a safe and supportive environment in which to learn.[32]

### III.    ANALYSIS

All Defendants seek summary judgment on the claims asserted by Plaintiff. The Court will address each Count with respect to each Defendant in turn.

---

[32] Plaintiff attempts to dispute the asserted fact by asserting "Battlefield High could not guarantee that N would be separated from the boys he had charged, several of whom had suffered discipline as a result." Dkt. 125 at 44 ¶ 94 (referring back to Plaintiff's asserted facts ¶¶ 85, 86). But the evidence that Plaintiff cites does not dispute the asserted fact or even support his own asserted fact, because it merely states that Scanlan "advised that it would not be known until mid-August whether it would prove possible to keep N separated from the boys he had accused." Accordingly, there is no genuine dispute of material fact.

A.    Declaratory or Injunctive Relief

The School Board argues that Plaintiff lacks standing to seek declaratory or injunctive relief, because he is no longer a PWCS student, his claim is based on conduct that has already occurred, and he will not return to PWCS. Dkt. 117 at 21.  In the operative complaint, Plaintiff seeks: (i) "a declaration that by their action and omissions set forth above, defendants violated the federally protected rights of N.S. to a safe, non-discriminatory environment"; and (ii) an "injunction barring defendants from failing to respond promptly and effectively to the legitimate concerns, complaints[,] and needs of gay students, including specifically N.S." Dkt. 23 at 28. In his Opposition, Plaintiff concedes that "N has but one year left of secondary school, beginning in the fall of 2025." Dkt. 125 at 54.  At the time the Opposition was filed, Plaintiff further concedes that whether Plaintiff would return to PWCS is "uncertain." *Id.*

A plaintiff must establish standing to seek injunctive relief by satisfying the case or controversy requirement of Article III. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  As the Fourth Circuit recognizes, when "the complained-of event has come and gone, it is too late for an injunction." *Wells v. Johnson*, 150 F.4th 289, 300 (4th Cir. 2025).  Even so, "a plaintiff may be able to use an injunction to ward off a *different* injury: The possibility that the troublesome event will recur." *Id.* (emphasis in original).  But such possibility must not be speculative. *See Adams Hous., LLC v. City of Salisbury, Md.*, 2018 WL 1251717, at *2 (4th Cir. Mar. 12, 2018) (rejecting the plaintiff's argument "that the City has arbitrarily and inconsistently enforced the Ordinance in the past and will continue do to so in the future" as "[t]hese contentions . . . do not demonstrate a reasonable expectation that the same action will recur").  As the Supreme Court emphasized, for an equitable remedy like injunctive relief to be available, there must be a "showing of [a] real or immediate threat that the plaintiff will be wronged again." *City*

27

*of L.A. v. Lyons*, 461 US. 95, 111 (1983) (finding the "speculative nature of Lyons' claim of future injury requires a finding that that this prerequisite of equitable relief has not been fulfilled").

At this point in 2026, Plaintiff is more than halfway through his senior year of high school and the best theory that the Opposition puts forward is that, at the time the Opposition was filed, it was "uncertain" whether Plaintiff would return to PWCS and was "predicated on the unknown outcome of [this] lawsuit." Dkt. 125 at 55. This is too speculative to support a claim for injunctive relief. As district judges in this District have previously recognized in the Title IX context, where a plaintiff alleges that he is "consider[ing] enroll[ing]," the plaintiff has "failed to show any real or imminent threat of . . . suffering from similar wrongdoing in the future." *Stover v. Coll. of William & Mary*, 635 F. Supp. 3d 429, 439 (E.D. Va. 2022) (finding that plaintiff "does not have standing to seek injunctive relief under Title IX or 42 U.S.C. § 1983"); *see also Eilenfeldt v. United C.U.S.D. #304 Bd. of Educ.*, 2012 WL 13014954, at *2 (C.D. Ill. Aug. 24, 2012) (finding that the plaintiff's claim to injunctive relief was moot because the plaintiff had graduated). Accordingly, where Plaintiff is not a PWCS student, where Plaintiff has no current plans to become a PWCS student, and where Plaintiff will shortly complete his senior year of high school not as a PWCS student, there is no real or imminent threat of suffering any similar alleged wrongdoing in the future, and Plaintiff lacks standing. Accordingly, the School Board MSJ will be granted in this regard.

Declaratory relief is different, but it is not "a get-out-of-standing-free card," and, if the declaratory judgment does not affect the rights of the litigants to the case, it is "just another way of saying *advisory opinion*." *Wells*, 150 F.4th at 301 (emphasis in original). A declaratory judgment provides a "decree of conclusive character" that has "preclusive effect." *Id.* The

28

Fourth Circuit has explained that, "[t]o have standing, then, a plaintiff must show both that future litigation is likely to happen (at least absent the declaration sought) and that the declaration's preclusive effects will likely help him in that litigation." *Id.* at 302. Plaintiff has not alleged or cited record evidence suggesting that he could demonstrate either element of this test. Thus, for many of the same reasons that Plaintiff lacks standing to seek injunctive relief, Plaintiff also lacks standing to seek declaratory relief, and accordingly the School Board MSJ will be granted in this regard.

### B.    Count I – Title IX

The School Board seeks summary judgment on the sole claim against it, asserted under Title IX. Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal assistance." 20 U.S.C. § 1681(a). To establish a Title IX claim based on student-on-student sexual harassment, a plaintiff must show that: (i) he or she was a student at an educational institution receiving federal funds; (ii) he or she suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived him or her of equal access to the educational opportunities provided by his or her school; (iii) the school, through an official who has authority to address the alleged harassment and institute corrective measures, had actual notice or knowledge of the harassment; and (iv) the school acted with deliberate indifference to the alleged harassment. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646-52 (1999). The School Board argues that Plaintiff has failed to demonstrate actual notice or deliberate indifference to alleged sexual harassment.

Before the Court addresses the legal arguments asserted by the School Board, however, it is helpful to frame the claims by Plaintiff and to recite the holdings from this Court's prior

29

Memorandum Opinion and Order (the "Opinion") (Dkt. 37).  The central premise of the Court's denial of the motion to dismiss was that Plaintiff had complained to the school regarding sexual harassment and immediately thereafter was subjected to further harassment during state-mandated testing.  Dkt. 37 at 20.  This is the legal framework upon which Plaintiff now hangs his hat.  As Plaintiff concedes, before May 2022, Plaintiff "said nothing of homophobia, . . . and his parents, knowing nothing, said nothing either."  Dkt. 125 at 47.[33]  Accordingly, Plaintiff premises his Title IX claim on "what was learned in May 2022, and what school administrators did not do thereafter."  *Id.* at 48.  With this framing in mind, the Court turns to the specific arguments at summary judgment.

### i.    Actual Notice

As the Fourth Circuit has explained, in the context of Title IX, a defendant school or school board is required to have "actual notice" or "actual knowledge."  *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 266 (4th Cir. 2021).  That is, "to be liable under Title IX, an appropriate school official must be '*advised of*' the alleged misconduct."  *Id.* (emphasis in original).  This stems from the principle that "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct."  *Davis*, 526 U.S. at 640.  This inquiry also asks, "whether an appropriate official in fact received such a report or complaint and whether a reasonable official would construe it as alleging misconduct prohibited by Title IX."  *Doe*, 1 F.4th at 268.

Thus, the Court must begin with when the School Board, through appropriate persons (Beemer and Boatwright) received actual notice of harassment falling within the purview of Title

---

[33] Although this reaction is completely understandable and unfortunate, it is not, as Plaintiff contends, "inconsequential."  Dkt. 125 at 47.  Because administrators can only act on (or be held liable for) for conduct of which they have actual knowledge, silence in the face of harassment both leaves the harassment unaddressed and limits Plaintiff's ability to recover.

IX.   Plaintiff identifies May 13, 2022, the day of the First Bathroom Incident, as the first date on which the School Board had actual notice.  Dkt. 125 at 48, 51 (conceding that prior to that time "neither N nor his parents complained of homophobic harassment" and asserting "N's known circumstances beginning May 13 suffice" to provide actual notice).[34, 35]  But Plaintiff does not assert what about the First Bathroom Incident put Beemer, Boatwright, or the School Board on notice of sexual harassment.  *Id.*  The summary judgment record supports only that, after he entered the bathroom, Plaintiff, in his own words, described the incident as, "I heard a bunch of boys come in and they started banging on the door and making weird noises.  As soon as I got up they all shuffled out and I didn't see any of their faces."  Dkt. 123-17.  The record does not reflect that Plaintiff reported anything sexual about the incident or that the description provided by Plaintiff was sufficient to alert Beemer or Boatwright that such incident was based on Plaintiff's sexual identity.  Moreover, although Plaintiff contends that Huntington had actual notice that First Bathroom Incident was based on homophobia according to the statements of

---

[34] The Court does note that the September 24, 2019 gym class incident in which Plaintiff was "pantsed" could, in some circumstances, constitute sexual harassment.  But Plaintiff here appropriately does not rely on that incident as providing actual notice where the undisputed facts on summary judgment demonstrate that Plaintiff tripped E.A. twice in that same class before the pantsing, where E.A. was disciplined, and where E.A. and Plaintiff did not have any further negative interactions.  *Compare* Dkt. 117 at 7 ¶¶ 17-20, 24 (alleging facts regarding incident with E.A.), *with* Dkt. 125 at 42-43 (not disputing the asserted facts).  Thus, Plaintiff does not argue and the Court does not find that the 2019 gym incident provided actual notice of sexual harassment.

[35] Although Plaintiff premises his Opposition on actual notice as of May 2022, in a later footnote he appears to disavow that concession.  Dkt. 125 at 50 n.45.  But Plaintiff never suggests as of what earlier date and based on what specific incident Beemer or Boatwright had actual knowledge.   Moreover, this argument contradicts Plaintiff's concession that Beemer and Boatwright did not know that Plaintiff was likely to be sexually harassed based on his sexual orientation.  *Id.* at 47; *Baynard v. Malone*, 268 F.3d 228, 237-38 (4th Cir. 2001) (finding no Title IX liability where the relevant official did not have "actual notice that Lawson was abusing one of his students").

other students,[36] Plaintiff provides no record evidence that *Huntington* provided such information to Boatwright – the only administrator with whom she is alleged to have spoken. *See* Dkt. 117-128 at 28 (Boatwright describing her understanding of the First Bathroom Incident as involving someone knocking on the stall); Dkt. 126-9 at 24:10-12 (Huntington indicating that she gave the student statements to a secretary – not directly to Boatwright).[37]  As courts across the country have recognized, generalized allegations of bullying do not constitute actual notice. *See, e.g.*, *Ruvalcaba v. Angleton Indep. Sch. Dist.*, 2019 WL 8273375, at *4 (S.D. Tex. Dec. 19, 2019) ("Ruvalcaba's reports of generalized bullying were insufficient to place AISD on actual

---

[36] Notice to Huntington is insufficient because she lacked authority under Title IX.  *See* Dkt. 117 at 4 ¶ 4; Dkt. 125 at 42 (not disputing paragraph 4).

[37] Plaintiff seeks to rely on Huntington's testimony to establish that Huntington told Boatwright what the students said such that there was actual notice to Boatwright.  Dkt. 125 at 20 ¶ 34.  But the excerpt of the Huntington deposition transcripts cited by Plaintiff, which do not include pages of testimony regarding this topic, do not confirm what specifically Huntington said to Boatwright.  Dkt. 126-9 at 20-24 (missing pages 21 and 23).  In the pages provided, however, Huntington does not testify that she told Boatwright what the girls said.  Huntington describes her role generally in working with Boatwright but does not specifically assert that she provided the information regarding the student statements on May 13 to Boatwright.  *Id.* at 22:7-11 ("But working with my administration, so working with Boatwright.  What that looks like is talking to Boatwright, letting her know all the information I had, and ideally, getting the issue of what these bathroom incidents and stuff addressed.").  Page 24 of deposition transcript begins halfway through the question and Huntington is asked: "you to do anything? Upon telling Ms. Boatwright what you had been told and handing over those statements, was there anything else you did in regard to Ms. Boatwright?"  *Id.* at 24:1-3.  Her answer: "Not that I recall." *Id.* at 24:4.  But, as courts frequently instruct, a question is not evidence and here the answer sheds no light on what specifically Huntington told Boatwright.  *United States v. Ellis*, 172 F.3d 864 (4th Cir. Feb. 22, 1999) (reciting and approving instruction that "[w]hat lawyers have said . . . in their questions is not evidence").  Moreover, as made clear in Huntington's later testimony, Huntington did not hand over the statements to Boatwright, but to a secretary.  *Id.* at 24:10-12.  Accordingly, the summary judgment record relied upon by Plaintiff does not support that Huntington provided such information to Boatwright so as to constitute actual notice of sexual harassment on May 13, 2022.  Indeed, it is also unclear that such information would have constituted actual notice in any event, where it contravened Plaintiff's own statement, as the alleged subject of the harassment, that the boys only made weird noises.

notice of severe sexual harassment . . . ."); *Lansberry v. Altoona Area Sch. Dist.*, 318 F. Supp. 3d 739, 751 (W.D. Pa. 2018) ("To place a school on 'actual notice' of sexual harassment, the plaintiff must allege 'actual notice of the sexual harassment itself, not merely bullying or teasing.'"); *Estate of D.B. by Briggs v. Thousand Islands Central Sch. Dist.*, 327 F. Supp. 3d 477, 531 (N.D.N.Y. 2018) (finding that a punching incident did not provide actual notice where "there is no indication that this incident involved any discriminatory motive based on gender stereotyping").[38]   Accordingly, the Court finds that, on this summary judgment record, a reasonable jury could not find that the First Bathroom Incident provided actual notice of sexual harassment to Beemer, Boatwright, or the School Board on May 13, 2022.

The Court next examines the Second Bathroom Incident on May 19, 2022.  This incident similarly fails to provide a connection to Plaintiff's sexuality or gender such that Beemer, Boatwright, or the School Board were on actual notice of sexual harassment.  Again, in Plaintiff's own words, Plaintiff describes that he was in the bathroom when a group of boys came in, slammed the stall door stating "come out so we can beat your a**," and then subsequently fled when Plaintiff kicked out the stall door.  Dkt. 123-21.  In his deposition, Plaintiff testified that he is not sure that the Second Bathroom Incident was motivated by homophobia, but that he believed it was, and conceded that he could not recall informing anyone that he believed the Second Bathroom Incident was the result of homophobia.  *See* Dkt. 117-124 at 193:22-194:1; *id.* at 267:9-16.  Again, such an incident may constitute bullying, but nothing about the incident, as

---

[38] Indeed, the facts of the *Briggs* case, in which the court granted summary judgment on the Title IX count, are somewhat similar to this case in that the court noted and relied upon the school official's statement that "no one, including D.B. himself, ever stated to me that any District student had used an antigay slur or slur suggesting gender stereotyping." *Briggs*, 327 F. Supp. 3d at 531.

deplorable as it may be, inherently relates to Plaintiff's sexuality. It was not until June 3, 2022, that Beemer or Boatwright had any information connecting the Second Bathroom Incident to Plaintiff's sexuality. Dkt. 126-53.[39] Thus, on much the same basis as the First Bathroom Incident, based on this summary judgment record, no reasonable jury could find that the Second Bathroom Incident provided actual notice of sex-based harassment to Beemer, Boatwright, or the School Board on May 19, 2022.[40]

A reasonable jury could, however, determine that Beemer, Boatwright, and the School Board had actual notice of allegations of sexual harassment as of May 23, 2022. On May 23, 2022, teachers forwarded emails from Plaintiff's mother to Beemer, in which Plaintiff's mother characterized prior incidents as sexual harassment. Dkt. 126-73.[41] A second teacher forwarded a similar email to Beemer and Boatwright on June 3, 2022. *Id.* Furthermore, on June 2, 2022, Scanlan notified Beemer that Plaintiff's family was asserting that the bathroom incidents were the result of homophobia. Dkt. 117 at 14 ¶ 58. And, on June 3, 2022, Beemer obtained statements from the boys involved in the Second Bathroom Incident. Dkt. 126-53. Thus, as of May 23, 2022, the School Board had actual notice of allegations of sexual harassment.

---

[39] Although the timeline is not completely clear given Plaintiff's use of excerpted deposition testimony, Beemer's testimony that he understood the incident involved someone shouting "something about gay a**, we can beat your gay a** or something to that effect" came about only after his conversation with Scanlan on June 2, 2022 (and therefore also later than Plaintiff contends). Dkt. 126-14 at 24:2-20; Dkt. 123-18 (June 2, 2022 email exchange between Scanlan and Beemer asking Beemer to look into the bathroom incidents).

[40] Importantly, the School Board's investigation revealed that the Second Bathroom Incident was *not* directed towards Plaintiff specifically. As the student stated that he did not know who was in the bathroom stall and asserted "[t]hat's just how I talk." Dkt. 117 at 15 ¶ 63; Dkt. 125 at 42 (not disputing paragraph 63).

[41] The email was sent on Sunday, May 22, 2022, which is not a school day.

ii.      Deliberate Indifference

Having determined that the School Board had actual notice as of May 23, 2022, the Court must then examine the School Board's subsequent actions to determine whether it was deliberately indifferent to such alleged sexual harassment.  As the Supreme Court has framed the deliberate indifference analysis, damages for peer harassment are only actionable if the harassment continued after notice to the school.  *Davis*, 526 U.S. at 645 ("[D]eliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it.").  Thus, courts have held that claims of deliberate indifference fail where "there is no evidence that the deficient response caused [the plaintiff] to undergo sexual harassment or made her liable or vulnerable to it." *Rouse v. Duke Univ.*, 914 F. Supp. 2d 717, 725 (M.D.N.C. 2012).  A school system's response must be "reasonably calculated to end the harassment." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689 (4th Cir. 2018).  The Fourth Circuit has also repeatedly reiterated that deliberate indifference is a "high bar" and that a school will only be liable for responses that are "clearly unreasonable in light of the known circumstances." *S.B. v. Bd. of Educ. of Hartford Cnty.*, 819 F.3d 69, 76–77 (4th Cir. 2016).

Although Plaintiff focuses much of his argument and asserted material facts on whether the administrators (and Boatwright in particular) were subjectively deliberately indifferent; deliberate indifference has an objective and subjective component. *See Koon v. North Carolina*, 50 F.4th 398, 404 (4th Cir. 2022).  Thus, in the Title IX context courts have recognized that, a claim of deliberative indifference fails where a defendant reasonably responds – objectively speaking – even if the defendant evinces an indifferent attitude. *Stiles ex rel. D.S. v. Grainger Cnty. Tenn.*, 819 F.3d 834, 849 (6th Cir. 2016) ("Plaintiffs' allegations that Defendants made rude or critical comments, offered unhelpful suggestions, and acted disrespectfully do not

35

undercut the reasonableness of Defendants' concrete actions taken in response to Plaintiffs' complaints.").[42]

Here, the summary judgment record does not indicate that Beemer, Boatwright, or the School Board were objectively deliberately indifferent to harassment of Plaintiff. After they had notice of the allegations of sexual harassment as of May 23, 2022, Beemer and Boatwright investigated the bathroom incidents. Administrators reviewed video surveillance of the Second Bathroom Incident and identified the students involved. Dkt. 117 at 14 ¶ 62; Dkt. 125 at 44 ¶ 62 ("Agreed . . . ."). After they were identified, the student who made the remarks was disciplined. Dkt. 117 at 15 ¶ 63; Dkt. 125 at 42 (not disputed). After Plaintiff received a strange email from D.K.,[43] staff at both RRMS and BHS investigated, identified the student, contacted the student's parents, and warned of a possible out-of-school suspension. Dkt. 117 at 15-16 ¶ 67; Dkt. 125 at 43 (not disputed). After this intervention, Plaintiff did not hear from D.K. again. *Id.* Plaintiff also concedes that other incidents, even though the School Board did not have actual notice that Plaintiff believed them to be sexual harassment, were addressed and such steps by the School Board effectively addressed the behavior. *See* Dkt. 117 at 6 ¶¶ 15-16 (drama class incident addressed in real-time by teacher and no further incidents); *id.* at 7-8 ¶¶ 17-24 (gym class incident addressed by Murgo and no further incidents in gym or with E.A.); *id.* at 8-9 ¶¶ 25-31 (art class incident addressed by temporarily moving M.R. and no further incidents in art class); *id.* at 9-10

---

[42] Although not on this particular point, the Fourth Circuit has cited the *Stiles* case with approval. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 701 (4th Cir. 2018) (citing *Stiles*, 819 F.2d at 851–52).

[43] It is not clear that the email from D.K. is connected to Plaintiff's sexual orientation. D.K. attended BHS with Plaintiff's sister. Dkt. 123-26 ("I called Battlefield to let them know and mentioned that [Plaintiff] has a sister at Battlefield in case this message was meant to go to her."). The message does not reference Plaintiff's sexuality and is instead a quote from Virginia Woolf. *Id.*

¶¶ 32-38 (no further incidents in locker room); *id.* at 11-12 ¶¶ 39-47 (incident investigated and teachers did not find Plaintiff's mother's account accurate); *id.* at 12 ¶¶ 48-50 (incident investigated, video surveillance reviewed, determined not to be purposeful, but both students nonetheless told to avoid one another); Dkt. 125 at 42-43 (not disputing paragraphs 15-16, 17-24, 25-31, 32-38, 39-47, 48-50).

Thus, the primary focus of the deliberate indifference claim is on the June 7, 2022 mandatory Standards of Learning examination for which Plaintiff returned to RRMS. At that time, the School Board had actual notice that Plaintiff complained that the bathroom incidents were the result of homophobia. Accordingly, the School Board permitted Plaintiff "to take the exam in the library and have access to a private restroom." Dkt. 117 at 15 ¶ 65; Dkt. 125 at 43 (not disputed). In his declaration, Plaintiff asserts that "on arrival I was once again subjected to homophobic slurring." Dkt. 126-4 at 3 ¶ 58. Plaintiff provides no further details regarding who subjected him to such slurs, what the slurs were, or where he alleges this interaction occurred. *Id.* Nor is there any suggestion that he informed anyone at the school of such interactions. Importantly, with respect to this incident, Plaintiff was also determined to have used "gay" to name-call. *See* Dkt. 117 at 19 ¶ 88; Dkt. 125 at 42 (not disputing paragraph 88). Moreover, such generalized and conclusory statements in an affidavit are insufficient to create a genuine issue of material fact to avoid summary judgment. The Supreme Court has recognized that a non-moving party may not avoid summary judgment by simply substituting "the conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).[44] Thus, this too does not demonstrate deliberate

---

[44] *Larkin v. Perkins*, 22 F. App'x 114, 115 & n. * (4th Cir. 2001) (holding that plaintiff's "own, self-serving affidavit containing conclusory assertions" was insufficient to withstand summary judgment); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)

indifference.  The School Board – on notice that the specific incidents in the bathroom were alleged to be homophobic – took action to alleviate that harm by providing a private restroom and did, indeed, protect Plaintiff from the harm identified, as Plaintiff's declaration does not identify any bathroom incidents on his June 7, 2022 return to school.   No further acts of harassment are alleged and, thus, under *Davis*, on this summary judgment record, no reasonable juror could determine that the School Board was deliberately indifferent.  *See* 526 U.S. at 645 ("[D]eliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it."); *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1124 (10th Cir. 2008) (finding that there was no deliberate indifference because the "district's response did not cause K.C. to undergo harassment or make her liable or vulnerable to it").[45]

Further supporting the lack of deliberate indifference by the School Board are the steps that Beemer, Boatwright, and the School Board took *after* June 7, 2022.  On June 10, 2022, Plaintiff submitted his first Title IX complaint to the School Board, which *for the first time* named 26 students and *for the first time* made allegations regarding homophobic name-calling.  Dkt. 117 at 16 ¶¶ 68, 70-71; Dkt. 125 at 42 (not disputing paragraphs 68, 70, 71).  Plaintiff specifically

---

("[S]ummary judgment affidavits cannot be conclusory."); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) ("To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations.  To the extent that these affidavits contain bald assertions and legal conclusions—for example, that Howe 'was always making racial slurs about minorities,' and that Schwapp 'was working in a hostile or abusive working environment'—the district court properly refused to rely on them."); *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (upholding district court's motion to strike conclusory allegations that racial slurs were commonly used in the workplace where plaintiff did not specify time or place of actions).

[45] Although not directly for this proposition, the Fourth Circuit has cited the *Rost* decision with approval.  *See Roe v. Marshall Univ. Bd. of Governors*, 145 F.4th 561, 568 (4th Cir. 2025) (citing *Rost*, 511 F.3d at 1121 n.1).

concedes that, prior to the June 10, 2022 complaint, neither Plaintiff nor his parents (with the exception of the 2019 art class incident that was addressed) ever reported that Plaintiff had been called homophobic slurs or been shoulder barged in the hallways. Dkt. 117 at 17 ¶¶ 77-79; Dkt. 125 at 42 (not disputing paragraphs 77, 78, or 79). In response to these new allegations, the School Board began an investigation which included interviews of Plaintiff, his parents, the accused students, student witnesses, and RRMS teachers and staff. Dkt. 117 at 18-19 ¶ 85; Dkt. 125 at 43 (not disputing paragraph 85). Where the School Board determined that Title IX or the Code of Behavior had been violated, those students were disciplined or otherwise referred for interventions. Dkt. 117 at 19 ¶¶ 86-87, 92; Dkts. 123-54 to 123-65; Dkt. 125 at 42 (not disputing paragraphs 86-89). Plaintiff does not dispute the sufficiency of either this investigation or the School Board's response to his claims. Dkt. 125 at 42 n.40 ("[Plaintiff's] claims are not predicated on school inaction antedating May 13, 2022, nor the September 2022 outcome of [Plaintiff's] various Title IX claims finding abundant discrete homophobic conduct victimizing [Plaintiff]."). Finally, the School Board was prepared to take supportive measures for Plaintiff's ninth-grade year at BHS, including working on Plaintiff's schedule to limit contact with the students that he identified in his Title IX complaint and "mutual no-contact orders." Dkt. 117 at 20 ¶ 94.[46]

---

[46] Plaintiff asserts that BHS could not "guarantee" that Plaintiff "would be separated from the boys he had charged." Dkt. 125 at 44 ¶ 94. But as Plaintiff himself notes, school staff merely "advised that it would not be known until mid-August" (presumably when all of the students had submitted their schedules) "whether it would prove possible to keep [Plaintiff] separated from the boys he had accused." *Id.* at 40 ¶ 85. Even so, the School Board offered to put in place "mutual no-contact orders." Dkt. 117 at 20 ¶ 94. Plaintiff does not explain why these efforts, especially the "mutual no-contact orders" offered by the School Board, would be insufficient to protect Plaintiff or were clearly unreasonable in the circumstances. Moreover, Plaintiff does not explain why such efforts would be required for *all of the boys* that he had accused, where some of those students were found *not* to have violated Title IX or the Code of Behavior and where Plaintiff does not challenge those determinations. Dkt. 117 at 20 ¶ 91 (identifying students who

Rather than address the specific steps towards remediation that the School Board took, Plaintiff generally argues that deliberate indifference is established by the School Board's "inaction, insufficient action, and belated action taken by Mr. Beemer and Ms. Boatwright in response to [Plaintiff's] *now-known* homophobic victimization."  Dkt. 125 at 49 (citing Plaintiff's own asserted facts in paragraphs 34-77 related to the bathroom incidents) (emphasis added).  But the School Board can only be held liable for deliberate indifference to incidents of which it had actual notice, and, as discussed *supra*, Beemer did not have notice of the sexual harassment nature of the bathroom attacks until May 23, 2022.  In response, Beemer and administrators reviewed surveillance videos and, by June 3, 2022, had identified and interviewed the students involved in the Second Bathroom Incident, despite a lack of identification by Plaintiff.  That is, in less than two weeks, with an intervening Memorial Day holiday, the School Board had responded to and disciplined the student who had made the sex-based remarks.  Dkt. 117 at 14 ¶ 62; Dkts. 123-22, 123-23 (student statements); Dkt. 125 at 44 ¶ 62 ("Agreed").[47] Although not dispositive, Plaintiff does not identify what additional steps should have been taken

---

did not violate Title IX or the Code of Behavior); Dkt. 125 at 43 (not disputing paragraph 91); *Id.* at 42 n.40 (asserting that Plaintiff does not predicate his claims on the outcome of the Title IX investigation).

[47] *See I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 376 (5th Cir. 2019) ("Contrary to I.F.'s theory that LISD's delayed investigation shows deliberate indifference, the evidence supports the conclusion that LISD performed an extensive investigation within a reasonable time."); *Karasek v. Regents of Univ. of Calif.*, 956 F.3d 1093, 1109 (9th Cir. 2020) ("To the contrary, within two weeks of Commin's report, UC placed Doe 2 on interim suspension . . . ."); *Doe v. Ohio Hi-Point Sch. Dist. Bd. of Educ.*, 716 F. Supp. 3d 575, 598 (S.D. Ohio 2024) ("The time from September 17 to September 30 amounts to shy of two weeks . . . [and] does not amount to deliberate indifference."); *Doe v. Hobart & William Smith Colls.*, 2021 WL 751272, at *7-*8 (W.D.N.Y. Jan. 25, 2021) (finding there was "no evidence of delay or inaction sufficient to support a claim of deliberate indifference[ ]" when "[l]ess than two weeks passed between the time plaintiff approached the Title IX office and the commencement of the investigation" and "[t]he entire process from initial disclosure to scheduling of the disciplinary hearing occurred within four months").

or how much more quickly the School Board should have acted, nor does Plaintiff cite any authority for his proposition that this less than two-week delay between notice and resolution demonstrates deliberate indifference.

The failure to address what the School Board should have done and why its actions were unreasonable is particularly important where Plaintiff acknowledges that not even this Court "can control teenage misbehavior." Dkt. 125 at 54 n.49. As Courts of Appeals have held, the suggestion that a "school system could or should have done more is insufficient to establish deliberate indifference" because the standard is whether its response to the known harassment is clearly unreasonable. *Porto v. Town of Tewksberry*, 488 F.3d 67, 73 (1st Cir. 2007). Moreover, the Supreme Court has explained that a school need not "remedy" peer harassment, but that they "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648. Here, the School Board responded to the known allegations of harassment as of May 23, 2022, and Plaintiff does not explain, or cite any authority establishing, that such response was insufficient. Moreover, that Plaintiff's family did not return Plaintiff to RRMS or PWCS does not mean that their response was insufficient or unreasonable. As the Court noted *supra*, the School Board was prepared to take steps to protect Plaintiff at BHS, and Plaintiff does not explain why such steps were clearly unreasonable or insufficient in the circumstances. *See Rost*, 511 F.3d at 1124 ("The fact that Ms. Rost rejected the alternatives the district provided and did not allow K.C. to return to school does not reflect on the appropriateness of the district's response and Ms. Rost does not allege any deficiency in this regard.").[48] Nor

---

[48] Courts have recognized, where a victim of sexual harassment voluntarily withdraws from school to avoid exposure to further harassment, that such withdrawal does not bar a finding of deliberate indifference. *See, e.g.*, *Spencer v. Univ. of N.M. Bd. of Regents*, 2016 WL 10592223, at *6 (D.N.M. Jan. 11, 2016) (recognizing that, where the victim of student-on-student sexual harassment *voluntarily* withdraws from school to avoid exposure to further

41

does the alleged failure to reach out proactively to Plaintiff's family constitute deliberate indifference where the School Board addressed the alleged harassment and attempted to work with the family regarding keep-separate procedures for Plaintiff and those that he accused.  Such conduct is troublesome and ill-advised, but it does not suffice to establish deliberate indifference sufficient to confer liability, and Plaintiff cites no authority suggesting otherwise.  *See Karasek*, 956 F.3d at 1109 ("Nevertheless, despite its lack of communication, UC acted on Karasek's complaint and imposed arguably appropriate sanctions on TH.  Thus, UC was not deliberately indifferent to Karasek's assault."); *K.C. by and through T.C. v. Marshall Cnty. Bd. of Educ.*, 762 F. App'x 226, 232 (6th Cir. 2019) ("Thus, the post-complaint faults that plaintiff alleges in the handling of his complaint – shoddy interviews, lack of communication, etc. – cannot constitute deliberate indifference because, even assuming those actions were deficient, they did not cause K.C. to suffer any further abuse.").

This leaves Plaintiff's reliance on testimony regarding Huntington's statements to Plaintiff's mother suggesting (if not outright stating) that Plaintiff should withdraw from RRMS to establish deliberate indifference.  Dkt. 125 at 26 ¶ 50 & n.27.  But Huntington made such a recommendation based on information that she had (which the record does not support was relayed to the administrators) regarding Plaintiff's circumstances at a time when the administrators did not have actual notice that Plaintiff was being harassed.  Dkt. 126-2 at 2-3 ¶¶ 31, 50 (indicating conversations between Plaintiff's mother and Huntington regarding Plaintiff's sexuality and sexual harassment prior to May 23, 2022).  Moreover, such recommendation was not predicated on the insufficiency of the administration's response to such

---

harassment there may yet be a viable Title IX claim).  But such withdrawal is not supportive of deliberate indifference here, where the School Board took reasonable steps to protect Plaintiff upon his return to RRMS and where it had agreed to take such steps if he had returned to BHS.

allegations of sexual harassment once they did have actual notice, because, of course, the recommendation to withdraw came first. Additionally, it appears that this recommendation was made out of concerns for Plaintiff's mental health, not out of concern for Plaintiff's physical safety.[49] It is further unclear in what way this recommendation, by a person who is indisputably not an appropriate official for purposes of Title IX, demonstrates the deliberate indifference of the School Board, especially where, after the appropriate officials learned that the bathroom incidents were alleged to be sexual harassment, they took reasonable steps to avoid further harassment. Accordingly, on this summary judgment record, no reasonable juror could find in these circumstances that the School Board was deliberately indifferent to Plaintiff's harassment and summary judgment in favor of the School Board is appropriate.

*     *     *

Plaintiff was undoubtedly unhappy, and justifiably so, during his time at RRMS and suffered in silence for too long. But, as Plaintiff concedes, "neither [he] nor his parents complained of homophobic harassment before May 2022." Dkt. 125 at 47. His silence is understandable given his age and circumstances, but it is not without legal consequences because, by keeping silent, he did not put administrators on notice of his suffering. It is further apparent to the Court that Plaintiff's parents took the best course of action for him in preemptively removing him from a situation where he was unhappy and where he did not feel free to complain. But in such circumstances the best course of action for Plaintiff is not commensurate with liability for the School Board. Plaintiff is not entitled to a remedy of his choice; nor is the School Board required to remedy the harassment at all, so long as they provide

---

[49] Indeed, although Plaintiff frames the two bathroom incidents as "assaults" and they were in the legal sense (and were undoubtedly disconcerting for him), it is worth noting that he does not assert that he was physically injured, or touched at all, during those incidents.

a reasonable response.  *See Davis*, 526 U.S. at 648–49 (holding that the standard is not that school must "remedy" peer harassment, but that they "must merely respond to known peer harassment in a manner that is not clearly unreasonable"); *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) ("An aggrieved party is not entitled to the precise remedy that he or she would prefer.").  In short, a school board is deliberately indifferent if their response to harassment is "clearly unreasonable in light of the known circumstances," and Plaintiff has not established that the School Board's response was unreasonable, nor even addressed the responses that they took in the wake of their receipt of actual notice.  *S.B.*, 819 F.3d at 76–77.  Accordingly, the School Board's MSJ will be granted.[50]

### C.      Count II – Equal Protection

Plaintiff's Equal Protection Clause claim against Beemer and Boatwright fails for some the same reasons as his Title IX claim.  The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.

---

[50] The Court notes that it reviewed the supplemental authority provided by Plaintiff and does not find it apposite.  In *Blair v. Appomattox County School Board*, 147 F.4th 484 (4th Cir. 2025), the Fourth Circuit found that the plaintiff had "sufficiently alleged deliberate indifference" such that the Title IX claim survived a motion to dismiss.  *Id.* at 492.  Here, the Court is analyzing the claims presented at a later stage of the proceedings on a fully developed record.  Moreover, there, the allegations were more serious and involved threats of sexual violence and threats to shoot the plaintiff.  *Id.*  Based on those threats of violence, the Fourth Circuit found the school's provision of a separate restroom inadequate, because there was "no indication that Appomattox County School Board took any action against the boys" engaging in the harassment.  *Id.*  Here, by contrast, in addition to providing the private restroom for the June 7 testing, the Defendants investigated video surveillance of the Second Bathroom Incident, identified the students involved, and provided discipline.  And, when the Defendants learned of more allegations of sexual harassment, the Defendants investigated further, provided discipline as appropriate, and offered measures to keep Plaintiff separate from those students at his future high school.  Thus, the Fourth Circuit's decision in *Blair* is inapposite to the full factual record presented here.

Courts recognize that the Equal Protection Clause protects a student's "right to be free from sexual harassment in an educational setting." *Feminist Majority*, 911 F.3d at 702. As this Court previously recognized, pursuant to the Fourth Circuit's *Feminist Majority* decision, a plaintiff may establish an equal protection claim based on deliberate indifference to known student-on-student sexual harassment where the plaintiff alleges: (i) that the plaintiff was subject to discriminatory peer harassment; (ii) that the school administrator responded with deliberate indifference; and (iii) the school administrator's deliberate indifference was motivated by discriminatory intent. *Id*. Like a Title IX claim, an equal protection claim requires that Beemer and Boatwright, "knew about harassment of the plaintiff 'and acquiesced in that conduct by refusing to reasonably respond to it.'" *Id*. at 703. As discussed *supra*, after Beemer and Boatwright learned that Plaintiff claimed the bathroom incidents were based on homophobia, they took steps to investigate and identify the students involved. Also, as recounted *supra*, the school generally addressed Plaintiff's complaints of bullying (without any knowledge that such complaints were premised on his sexuality) and generally resolved those incidents such that there was no repeat of such behavior in either the location or between Plaintiff and the identified student. Accordingly, for the same reasons as with respect to the School Board, on this record no reasonable juror could find in favor of Plaintiff and the Individual Defendants are entitled to summary judgment on the Equal Protection claim.

### D.    Count IV – Gross Negligence[51]

Gross negligence is "that degree of negligence which shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of

---

[51] As noted *supra*, Count III was dismissed at the motion to dismiss stage, and Plaintiff chose not to further amend his complaint.

[another]. It must be such a degree of negligence as would shock fair minded [people] although something less than willful recklessness." *Ferguson v. Ferguson*, 212 Va. 86, 92 (1971); *Green v. Ingram*, 269 Va. 281, 290–91 (2005). A claim of gross negligence will not lie where the defendant is shown to have exercised some degree of care toward the plaintiff. *See Whitley v. Commonwealth*, 260 Va. 482, 488–90 (2000); *Colby v. Boyden,* 241 Va. 125, 133 (1991). Unlike the Title IX and Equal Protection claims, Plaintiff's gross negligence claim is divorced from his sexual orientation.

The Individual Defendants first argue that there is no duty here. Both parties, in arguing whether any such duty exists, rely on the Supreme Court of Virginia's decision in *Burns v. Gagnon*, 283 Va. 657 (2012). In *Burns*, the court recognized that a vice principal had a duty to care for and supervise a student because "Gagnon's parents had to send Gagnon to school, where it was the responsibility of Burns and other school officials to supervise." *Id.* at 671. Judges within this District have held that, "[b]ecause a school has an obligation to adequately supervise the activities of students within its charge and may be held liable for a foreseeable injury proximately related to the absence of such supervision, whether a duty of care exists may turn on the factual circumstances of the case." *DJ ex rel. Hughes v. Sch. Bd. of Henrico Cnty.*, 488 F. Supp. 3d 307, 340–41 (E.D. Va. 2020). On this summary judgment record, the Court assumes without deciding that there was such a duty here.

The Court then turns to whether the summary judgment record indicates that the Individual Defendants exercised "some degree of care." The Court finds that they did. With respect to Boatwright, it is undisputed that Boatwright learned of the First Bathroom Incident on the day it occurred or the Monday after. Dkt. 108 at 12 ¶ 65. Boatwright thereafter began an investigation by following up with Plaintiff. Plaintiff told Boatwright that he could not identify

46

any of the individuals.  *Id.* at ¶ 66.  Moreover, the statement that Boatwright received regarding the event was that a group of boys entered the bathroom and made "weird noises." *Id.* at ¶ 64.[52] Additionally, although Plaintiff makes some vague references to the First Bathroom Incident being resolved without an examination of videotapes, there is no fact in the record suggesting that there was such video surveillance that would have captured the events in question.[53]   Thus, a reasonable juror could not find that Boatwright failed to exercise some degree of care where she had spoken to Plaintiff; nor could a reasonable jury find that a failure to do more, where Plaintiff reported only banging on stall doors and weird noises, "shocks fair minded people." *Commonwealth v. Giddens*, 295 Va. 607, 615 (2018) (finding failure to investigate a complaint did not constitute gross negligence where defendant relied on the "evidence before him"). Accordingly, summary judgment in favor of Boatwright is appropriate both because the record demonstrates that she exercised some care and because the record does not demonstrate an utter disregard of prudence as necessary to sustain a gross negligence claim.

---

[52] Plaintiff does not dispute the Individual Defendants' asserted facts in paragraphs 64 or 65.  Dkt. 125 at 41.  As discussed *supra*, Plaintiff does attempt to dispute that Boatwright followed up with him, but he does so through an affidavit that contradicts his deposition testimony which is insufficient at summary judgment to create a genuine issue of material fact. *Contrast* Dkt. 126-4 ¶ 44 ("No one from administration ever asked me about what had happened to me in the bathroom."), *with* Dkt. 136-137 at 265:13-17 (Q. . . .  Did you ever talk to Ms. Boatwright about that incident? A. I don't recall."); *see also Mitchael*, 179 F.3d at 854–55 (finding an affidavit from a witness that "more clearly recalled discussions and meetings" that the witness could not remember during his deposition "arguably contradicted his deposition" and therefore "represent[ed] an attempt to create a sham issue of fact"); *Reich*, 945 F.3d at 976 ("Where a deponent is 'asked specific questions about, yet denie[s] knowledge of, the material aspects of her case, the material allegations in her affidavit directly contradict her deposition.'").

[53] The summary judgment record is unclear, and Plaintiff does not argue, that the incidents occurred in the same bathroom such that there would necessarily have been video surveillance available.  Dkt. 113-19 (the First Bathroom Incident occurred in a restroom by the performance hall); Dkts. 123-22, 23, 24 (not identifying the location of Second Bathroom Incident).

The gross negligence claim against Beemer has even less to support it on this summary judgment record. The summary judgment record does not indicate that Beemer learned of the First Bathroom Incident before the Second Bathroom Incident occurred. *See* Dkt. 125 at 21 ¶ 39 ("Ms. Boatwright told Mr. Beemer about the May 13 bathroom assault, but he professes inability to recall when this occurred."). Without facts in the record that Beemer knew of the First Bathroom Incident *before* the Second Bathroom Incident occurred, no reasonable juror could determine that Beemer acted with an "utter disregard for prudence." *Ferguson*, 212 Va. at 92. With respect to Beemer's conduct after he learned of such information, as discussed *supra*, the record reflects that Beemer took reasonable steps to address the issues presented to him. Accordingly, on this record, summary judgment is also appropriate in favor of Beemer on the gross negligence claim.[54]

In short, as the Fourth Circuit has recognized, in Virginia, "the standard for gross negligence is one of indifference, not inadequacy." *Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008). Even divorcing the First Bathroom Incident from Plaintiff's sexual orientation, Boatwright demonstrated some degree of care such that no reasonable juror could find in Plaintiff's favor on the gross negligence claim. Beemer is not alleged to have known of the First Bathroom Incident before the Second Bathroom Incident. And, given what Plaintiff himself reported about the First Bathroom Incident (knocking on stall doors and making weird noise by teen or preteen boys), it does not demonstrate utter disregard for Plaintiff's safety for administrators, after learning Plaintiff's version of events and that he could not identify the

---

[54] Plaintiff does not address, with respect to either Individual Defendant, the standard applicable to a gross negligence claim, namely whether the Individual Defendants demonstrated a degree of care or whether their conduct demonstrated an utter disregard of prudence.

individuals involved, not to investigate further. Accordingly, the Individual MSJ will be granted in this regard.[55]

## IV.    CONCLUSION

On this summary judgment record, no reasonable juror could find in favor of Plaintiff on any of his three remaining claims. The record does not demonstrate that Defendants were deliberately indifferent to any sex-based harassment of which they had notice. Moreover, the record does not support that the Individual Defendants exercised no care or that their conduct demonstrated an utter disregard of prudence.

Accordingly, it is hereby ORDERED that the Individual MSJ (Dkt. 107) is GRANTED; and it is

FURTHER ORDERED that the School Board MSJ (Dkt. 116) is GRANTED; and it is

FURTHER ORDERED that the Motion to Strike (Dkt. 143) is DENIED; and it is

---

[55] Plaintiff's other pieces of supplemental authority are submitted presumably to address the gross negligence claim. Plaintiff cites this Court's decision in *J.M.H. v. Prince William School Board*, 2025 WL 2734556 (E. D. Va. Sep. 25, 2025). In *JMH*, the Court found that claims against a security guard could go forward because the claims were very close to those in *Burns*. Like *Burns*, the *JMH* case involved a situation where a school security guard was advised of an upcoming attack on a student and the school security guard took no steps to protect the student. Those facts are fundamentally different from the facts presented here. Moreover, applying the some degree of care standard, the Court recently held that the same plaintiff did not adequately allege gross negligence against a nurse. *See JMH v. Prince William Sch. Bd.*, 2026 WL 701353, at *1 (E.D. Va. Mar. 12, 2026). The Court of Appeals of Virginia's decision in *Egan v. Ream*, 2025 WL 2445508 (Va. Ct. App. Aug. 26, 2025), is likewise inapplicable. That was also a decision on demurrers, and thus a less developed record than available here. Moreover, the allegations in that case were different than those presented here because the Court of Appeals determined that there was no allegation of "slight care." *Id.* at *3. And, the factual circumstances, involving students who were the subject of IEPs requiring close care, are also not like those presented here. *Id.* ("Notwithstanding the requirement for close and direct supervision, and the fact that they consisted of a quarter of the students in the classroom, Abigail and C.D. left the classroom, unnoticed by Hixon or Ream. Although Ream stepped outside of the classroom and glanced down the hall while Abigail and C.D. were absent from the classroom, the Egans allege that he failed to take any further action in locating the students."). Accordingly, these cases do not alter the result reached here.

FURTHER ORDERED that the Clerk of the Court is DIRECTED to enter Rule 58 judgment in favor of Defendants and against Plaintiff on Counts I, II, and IV of the Amended Complaint and to place this matter among the ended causes.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
March 19, 2026

_____ /s/ _____

Rossie D. Alston, Jr.
United States District Judge